L. Patrick GRAY, III, Appellant,

v.

Griffin BELL, et al.

No. 82–1838.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 23, 1983.
Decided June 21, 1983.

Alan I. Baron and Ellen Scalettar, Baltimore, Md., for appellant.

John Oliver Birch, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Valerie K. Schurman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before MIKVA, EDWARDS and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

### TABLE OF CONTENTS

| | Page |
|---|---|
| I. BACKGROUND | 493 |
| A. Facts | 493 |
| B. Judicial Proceedings | 494 |
| II. OFFICIAL IMMUNITY | 495 |
| A. Introduction: The Basic Concept of Official Immunity | 495 |
| B. Absolute Prosecutorial Immunity | 497 |
| 1. The Rationale for According Absolute Immunity to Prosecutors | 497 |
| 2. The Scope of Absolute Prosecutorial Immunity | 498 |
| C. Application of Official Immunity In This Case | 502 |
| 1. Counts One and Two: The Constitutional Claims | 502 |
| (a) Conduct Before the Grand Juries | 502 |
| (b) Other Pre-Indictment Conduct | 504 |
| 2. Count Four: The Malicious Prosecution Claim | 505 |
| III. SOVEREIGN IMMUNITY | 506 |
| A. The "Investigative or Law Enforcement Officer" Proviso to 28 U.S.C. § 2680(h) | 507 |
| B. The Language and Legislative History of 28 U.S.C. § 2680(a) | 508 |
| C. The Purpose of a Governmental Immunity for Discretionary Acts | 509 |
| D. The Case Law Interpretation of the Discretionary Function Exception | 511 |
| E. Application of the Discretionary Function Exception In This Case | 513 |
| IV. CONCLUSION | 516 |

HARRY T. EDWARDS, Circuit Judge:

Beginning in the Spring of 1976, the Justice Department conducted a two-year investigation of alleged Federal Bureau of Investigation ("FBI") break-ins against various relatives and acquaintances of suspected members of the Weatherman Underground Organization. Following this investigation, the appellant, L. Patrick Gray, III, who served as Acting Director of the FBI during the Nixon administration, was indicted by a federal Grand Jury for conspiracy to violate the rights of citizens. Government prosecutors subsequently acknowledged serious weaknesses in their case and agreed to voluntary dismissal. Gray believed that the indictment never should have been returned. Alleging gross

negligence and malice in the Justice Department's pre-indictment investigation and Grand Jury presentations, he brought this suit for damages against the United States, former Attorney General Griffin Bell and certain other alleged participants in the prosecution. The trial court dismissed the complaint, holding, *inter alia,* that the individual defendants are protected by absolute official immunity, and that the United States is protected by the reservation of sovereign immunity in the "discretionary function" exception to the Federal Tort Claims Act ("FTCA").[1] 542 F.Supp. 927. We affirm.

## I. Background

### A. Facts

■ We take the following factual allegations to be true.[2] In April 1976, the Justice Department commenced an investigation into the FBI's use of illegal break-ins against family members and friends of Weatherman suspects. During the course of and as part of this inquiry, prosecutors presented evidence to several Grand Juries. The investigation culminated in April 1978 when a Grand Jury sitting in Washington, D.C., indicted Gray and two other high-ranking FBI officials, W. Mark Felt and Edward S. Miller, for having conspired to deprive certain relatives and acquaintances of Weatherman fugitives of their rights under 18 U.S.C. § 241 (1976).[3]

The Government's case against Gray rested principally on his alleged issuance of generic authorization of surreptitious entries into the residences of friends and relatives of Weatherman fugitives. According to the indictment, Gray's authorization was issued in September of 1972, during two conferences of FBI Special Agents in Charge ("SAC"). In their Grand Jury presentations, representatives of the Justice Department "claimed that their investigation revealed that 67 persons attended those two SAC conferences, that 9 persons could provide testimony to support their 'generic authorization' theory, and that the remaining 58 persons had no recall one way or the other of relevant assertions by [Gray]." Amended Complaint and Demand for Jury Trial, *reprinted in* J.A. 9–10.

An independent post-indictment investigation by Gray's attorneys brought out serious gaps in the generic authorization theory and revealed the Justice Department's investigation to have been incomplete in several important respects. Government investigators failed to take account of a significant number of persons in attendance at the SAC meetings who stated that they did not recall Gray authorizing any surreptitious entries and that they would not have likely forgotten such an instruction. Furthermore, two of the nine witnesses whose testimony purportedly supported the generic authorization theory specifically said Gray had not given such a directive at the September 1972 meetings. Government investigators also had or could have obtained FBI Agents' detailed notes of what transpired at the SAC conferences and these

1. Act of Aug. 2, 1946, ch. 753, §§ 401–424, 60 Stat. 812, 842–47 (codified as amended in scattered sections of 28 U.S.C.).

2. In evaluating the propriety of the grant of a motion to dismiss, we must of course accept all well pleaded allegations of the complaint as true. *See Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 172, 87 S.Ct. 1526, 1529, 18 L.Ed.2d 704 (1967). Dismissal is proper only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

3. The indictment charged that Gray, Felt and Miller conspired

to injure and oppress citizens of the United States who were relatives and acquaintances of Weatherman fugitives, in the free exercise and enjoyment of certain rights and privileges secured to them by the Constitution and laws of the United States, including the right secured to them by the Fourth Amendment to the Constitution of the United States to be secure in their homes, papers and effects against unreasonable searches and seizures.

Amended Complaint and Demand for Jury Trial, Exhibit A, *reprinted in* Joint Appendix ("J.A.") 1, 35. Felt is a former Acting Associate Director of the FBI, and Miller is a former Assistant Director of the FBI's Intelligence Division.

notes failed to show that Gray had authorized the use of surreptitious entries.

Gray claims that, as a direct result of these investigative deficiencies, the prosecution's presentation to the indicting Grand Jury gave a wholly inaccurate and distorted picture of what went on at the SAC conferences. Prosecutors failed to call witnesses who, had they been adequately interviewed or interviewed at all, would have testified favorably to Gray. There was no attempt to apprise the Grand Jury of the existence of contemporaneous notes omitting mention of the alleged blanket authorization. The testimony of the notetakers was not presented to the Grand Jury. And one witness who gave incriminating testimony later said that he would not have so testified had his memory been refreshed by the notes.

Gray also contends that the prosecutors affirmatively misled and presented what proved to be false evidence to the indicting Grand Jury. For example, Gray asserts that the prosecutors represented that: (1) the break-ins had begun after Gray was appointed Acting Director, when in fact break-ins had begun two years before Gray's appointment; and (2) in October 1972 Gray had approved a training lecture on the use of illegal break-ins as an investigative technique, when in fact the agent who allegedly gave the lecture was suspended from duty at the time the training course was supposed to have taken place.

Gray forcefully urges that all of these cited investigative and prosecutorial omissions, deficiencies and misrepresentations resulted from either gross negligence or willful and wanton disregard for his rights.

### B. Judicial Proceedings

On March 5, 1979, District Court Judge Bryant severed Gray's trial from the trial of Felt and Miller. Gray's trial was then scheduled to follow the trial of his alleged compatriots. In August 1980, shortly before commencement of the trial of Felt and Miller, Gray moved to dismiss the indictment against him on the grounds of prosecutorial misconduct in the Government's investigation and Grand Jury presentations. The withholding of exculpatory evidence and the presentation of false and misleading evidence, he alleged, had denied him his Fifth Amendment rights to due process and to a fair and impartial Grand Jury. The allegations of misconduct on which the motion was based parallel Gray's averments here.

Judge Bryant denied Gray's motion to dismiss on October 3, 1980, noting that "the exhaustive and admirable investigation by counsel for Mr. Gray has revealed certain weaknesses in the case the government presented to the grand jury," but that "the factual lacunae attributed to the prosecutors reflect an honest, albeit imperfect, attempt to recreate past events."[4] Prosecutors readily acknowledged these weaknesses, but indicated that they expected the trial of Felt and Miller to reveal testimony substantiating the charges against Gray. Without that testimony, prosecutors conceded, further proceedings against Gray would be unwarranted. Felt and Miller were convicted on November 6, 1980,[5] yet their trial failed to bring out evidence strengthening the Government's case against Gray. Government prosecutors accordingly filed a nolle prosequi on December 10, 1980, acknowledging that the charges against Gray were "unconvincing" and voluntarily dismissing the indictment against him.

Gray filed this suit on April 9, 1981, seeking money damages for injury to his personal and professional reputation, extreme emotional distress and mental anguish, and associated physical ailments. The United States, former Attorney General Bell, and various Justice Department attorneys who

---

4. *United States v. Gray*, Crim. No. 78–00179 (D.D.C. dismissed Dec. 10, 1980) (Memorandum and Order), *reprinted in* Supplemental Appendix ("S.A.") 14, 18.

5. President Reagan granted Felt and Miller full and unconditional pardons on March 27, 1981.

had allegedly participated in the abortive prosecution against Gray were named as defendants.[6] The single-count complaint alleged that the defendants violated Gray's Fifth Amendment rights to due process and to an informed and impartial Grand Jury by conducting a grossly negligent pre-indictment investigation and, as a result, failing to present exculpatory evidence and presenting false and misleading evidence to the Grand Jury.

The Government moved to dismiss the complaint in July 1981. While that motion was pending, an amended complaint filed in January 1982 added three counts. The original allegations of gross negligence in the pre-indictment investigation were reconstituted as Count One of the amended complaint. In a new Count Two, Gray further alleged that the defendants willfully, wantonly and maliciously violated his Fifth Amendment rights by deliberately presenting false and misleading evidence to and withholding exculpatory evidence from the Grand Jury. Count Three of the amended complaint alleged a claim against the United States under the FTCA, incorporating the allegations of Counts One, Two and Four. Count Four averred a common law claim for malicious prosecution.

The trial court granted the Government's motion to dismiss on July 9, 1982. As to Count One, the court ruled that Government prosecutors had no duty to conduct their investigation in a fair and thorough manner; even if there was such a duty, the court explained, the individual defendants were entitled to absolute immunity because their investigation had sufficiently focused on Gray, and, thus, they were engaged in a quasi-judicial function. As to Count Two, the court held that Government prosecutors had at most a duty not to deliberately present false evidence to the Grand Jury, and, in any event, presentation of evidence to a Grand Jury is clearly a quasi-judicial function protected by absolute immunity.[7] As to Count Three, the court found that the United States had not waived its sovereign immunity under the FTCA because the challenged conduct fell within the "discretionary function" exception of 28 U.S.C. § 2680(a) and, in addition, the individual defendants were not "investigative or law enforcement officers" within the meaning of 28 U.S.C. § 2680(h). Finally, the court held that the claim under Count Four was barred because, whatever the scope of the individual defendants' immunity from suit on the constitutional claims, absolute immunity precludes suit against them for the common law tort of malicious prosecution.

This appeal followed.

## II. OFFICIAL IMMUNITY

### A. *Introduction: The Basic Concept of "Official Immunity"*

 State and federal officials receive a judicially fashioned immunity for all discretionary acts arguably within the ambit of their authority. There are two basic forms of official immunity. The first, *abso-*

---

**6.** In addition to the United States and Attorney General Bell, the named defendants were Benjamin Civiletti, Assistant Attorney General in charge of the Justice Department's Criminal Division; Barnet D. Skolnik, Special Counsel in the Criminal Division; J. Stanley Pottinger, Director of the Justice Department's Civil Rights Division; and various Justice Department prosecuting attorneys assigned to the FBI investigation task force, including Paul R. Boucher, Dennis Dimsey, Daniel S. Friedman, William L. Gardner, Paul R. Hoeber, John P. Lydick, Francis P. Martin, Brian Murtaugh, James C. Savage, Janis Sposato, and Breckinridge L. Willcox.

**7.** The court supported dismissal of Count One on the alternative ground of qualified immunity: "Assuming that defendants did owe Gray a duty under the Fifth Amendment to conduct a careful, thorough pre-indictment investigation, that duty was not clearly established at the time of their actions." 542 F.Supp. at 931 n. 5. The same alternative reasoning appears to have been given as to Count Two, *see id.* at 932 n. 6, although the court never explicitly addressed whether Government prosecutors owed Gray a clearly established duty under the Fifth Amendment not to knowingly present false evidence or withhold exculpatory evidence from the Grand Jury.

*lute immunity,* bars a suit at the outset and frees the defendant official of any obligation to justify his actions. The second, *qualified immunity,*[8] is in the nature of an affirmative defense and protects an official from liability only if he can show that his actions did not contravene clearly established statutory or constitutional rights of which a reasonable person in his position should have known. The levels of protection afforded by these two forms of immunity, once sharply different, are no longer so distinct. Qualified immunity remains an "affirmative defense that must be pleaded by a defendant official," *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982), but subjective motivation is no longer relevant and the defense— now "defin[ed] . . . essentially in objective terms," *id.,* 102 S.Ct. at 2739—may appropriately be determined by the trial judge on summary judgment, *id.* On the other hand, under the functional analysis governing absolute immunity, *see Butz v. Economou,* 438 U.S. 478, 508–17, 98 S.Ct. 2894, 2911–16, 57 L.Ed.2d 895 (1978), "a limited factual inquiry may in some cases be necessary to determine in what role the challenged function was exercised," *Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981), thus precluding on occasion disposition at the Rule 12 stage.

Official immunity is principally justified as a "shield against liability that will serve the public interest in the vigorous exercise of legitimate executive authority." *Chagnon v. Bell,* 642 F.2d 1248, 1256 (D.C.Cir. 1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981).[9] Additional reasons for according official immunity, less frequently articulated but no less important, include the need to minimize the deterrent effect of potential personal liability on those who otherwise might enter public office, the perceived drain on valuable official time devoted to defense of myriad suits, the inequity of exposing officials to vicarious liability for the acts of subordinates, the notion that government servants owe a duty to the public rather than to the individual, and the idea that official accountability is more appropriately enforced through the ballot and in criminal or re-

---

**8.** In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court stated the test for *qualified immunity* as follows:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . .
>
> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Id.,* 102 S.Ct. at 2738–39 (citations and footnotes omitted).

**9.** The Supreme Court has stated:

> Among the most persuasive reasons supporting official immunity is the prospect that damages liability may render an official unduly cautious in the discharge of his official duties. As Judge Learned Hand wrote . . . , "[t]he justification for . . . [denying recovery] is that it is impossible to know whether the claim is well founded until the case has been tried, and to submit all officials, the innocent as well as the guilty, to the burden of trial and the danger of its outcome would dampen the ardor of all but the most resolute . . . ."

*Nixon v. Fitzgerald,* 457 U.S. 731, 752, 102 S.Ct. 2690, 2703 n. 32, 73 L.Ed.2d 349 (1982) (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)).

moval proceedings than in private civil suits.[10]

■ In applying principles of official immunity, the Supreme Court has made it clear that *absolute immunity* is only available if the claim is based on performance of a governmental function so sensitive as to warrant complete freedom from suit.[11] Over the past decade, the Court has sought to delimit the doctrine by identifying certain functionally discrete areas of official conduct—characterized by their unique importance or constitutional status—that deserve absolute immunity from suit for violations of federal law; among the positions so identified are those of the President,[12] legislators,[13] judges,[14] and various executive officials exercising quasi-judicial duties—including prosecutors.[15]

### B. *Absolute Prosecutorial Immunity*

#### 1. *The Rationale for According Absolute Immunity to Prosecutors*

The justifications offered for according absolute immunity to prosecutors largely track those advanced in support of official immunity. Although, in many cases, these justifications support only a qualified immunity, the Supreme Court has identified certain factors that at once distinguish the prosecutorial function from the functions of other executive officials and justify an absolute shield against the threat of suit.[16]

First, it has been noted that a prosecutor is especially vulnerable to retaliatory litigation.[17] A prosecutor almost daily brings to bear the enormous power of the state against individuals; the weight of that power and the general opprobrium of the criminal sanction combine to create a

**10.** *See Robichaud v. Ronan,* 351 F.2d 533, 535–36 (9th Cir.1965). *See also* Note, 66 Harv.L. Rev. 1285, 1295 n. 54 (1953).

**11.** *See Harlow v. Fitzgerald,* 102 S.Ct. at 2733 ("For executive officials in general . . . qualified immunity represents the norm," but "the special functions of some officials might require absolute immunity."); *Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978) ("Although a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations, . . . there are some officials whose special functions require a full exemption from liability.").

**12.** *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349.

**13.** *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).

**14.** *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978).

**15.** *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). *See Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (administrative law judges and agency enforcement officials); *Briscoe v. LaHue,* —— U.S. ——, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (witnesses). *See also International Union, UAAAIW v. Greyhound Lines, Inc.,* 701 F.2d 1181 (6th Cir.1983) (arbitrators); *White v. Hegerhorst,* 418 F.2d 894 (9th Cir.1969) (per curiam) (petit jurors), *cert. denied,* 398 U.S. 912, 90 S.Ct. 1710, 26 L.Ed.2d 74 (1970); *Martone v. McKeithen,* 413 F.2d 1373 (5th Cir.1969) (per curiam) (grand jurors); *Henig v. Odorioso,* 385 F.2d 491 (3d Cir.1967) (court employees executing judicial orders), *cert. denied,* 390 U.S. 1016, 88 S.Ct. 1269, 20 L.Ed.2d 166 (1968); Casto, *Innovations in the Defense of Official Immunity Under Section 1983,* 47 Tenn.L.Rev. 47, 84 n. 182 (1979) ("a judge's law clerk should receive the same immunity as the judge").

**16.** *See Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128; *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895.

**17.** *See Imbler v. Pachtman,* 424 U.S. at 425, 96 S.Ct. at 992 ("suits [against prosecutors] could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate"); *Butz v. Economou,* 438 U.S. at 515, 98 S.Ct. at 2915 ("An individual targeted by an administrative proceeding will react angrily and may seek vengeance in the courts. A corporation will muster all of its financial and legal resources in an effort to prevent administrative sanctions. 'When millions may turn on regulatory decisions, there is a strong incentive to counter-attack.'") (quoting *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst.,* 566 F.2d 289, 293 (D.C.Cir.1977) (en banc), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978)). *Cf. Briscoe v. LaHue,* 103 S.Ct. at 1119 ("Section 1983 lawsuits against police officer witnesses, like law lawsuits against prosecutors, 'could be expected with some frequency.'" (quoting *Imbler,* 424 U.S. at 425, 96 S.Ct. at 992)).

unique potential for vengeful counter suits. Absolute immunity is thus justified "by the concern that [prosecutors] . . .—required by law to make important decisions regarding the initiation, conduct, and merit of controversies which often excite 'the deepest feelings' of the parties—would be intimidated in the exercise of their discretion by the fear of retaliatory lawsuits brought by angry defendants." *Marrero v. City of Hialeah,* 625 F.2d 499, 507 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981).

Second, it has been recognized that built-in safeguards diminish the need for private redress against prosecutorial abuse.[18] Inherent in the judicial process are checks that serve to restrain prosecutorial abuse, and any abuse that does occur is subject to various self-remedying mechanisms of the adversarial process. As Judge Leventhal once aptly observed,

> the prosecutor's absolute protection, like that of the judge from which it is derived, is both justified and bounded by the judicial traditions and procedures that limit and contain the danger of abuse. Cases holding prosecutors absolutely immune have referred to them as "quasi-judicial officers," and the circumstances typically provide alternative instruments of the judicial branch to check misconduct—the discretion of the grand jury, the procedures of a trial, and the potential sanction of discipline imposed by the court itself.

*Apton v. Wilson,* 506 F.2d 83, 93–94 (D.C. Cir.1974) (footnotes omitted).

Mindful of the distinctive functional characteristics of a prosecutor's position, we turn to the scope of the prosecutor's absolute immunity.

### 2. The Scope of Absolute Prosecutorial Immunity

In *Imbler v. Pachtman,* the Supreme Court, in an explicitly limited holding, ruled that "the prosecutor is immune from a civil suit for damages under § 1983" in "initiating a prosecution and in presenting the State's case." 424 U.S. at 431, 96 S.Ct. at 994. These activities, the Court observed, are "intimately associated with the judicial phase of the criminal process, and thus [are] functions to which the reasons for absolute immunity apply with full force." *Id.* at 430, 96 S.Ct. at 995. The Court went no further in *Butz v. Economou,* where agency officials were accorded absolute protection from suits arising out of "[t]he decision to initiate administrative proceedings" and "the presentation of evidence on the record in the course of an adjudication." 438 U.S. at 515, 517, 98 S.Ct. at 2915, 2916.[19]

---

**18.** *Imbler v. Pachtman,* 424 U.S. at 429, 96 S.Ct. at 994 (checks provided by criminal and ethical sanctions "undermine the argument that the imposition of civil liability is the only way to insure that prosecutors are mindful of the constitutional rights of persons accused of crime"); *Butz v. Economou,* 438 U.S. at 512, 98 S.Ct. at 2913 ("safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct"). *Cf. Briscoe v. LaHue,* 103 S.Ct. at 1121 n. 32 ("[I]n those cases in which the judicial process fails, the public is not powerless to punish misconduct. Like prosecutors and judges, official witnesses may be punished criminally for willful deprivations of constitutional rights . . . .").

**19.** The *Imbler* Court left open the question "whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." 424 U.S. at 430–31, 96

S.Ct. at 994–95. This reservation was noted in *Butz,* 438 U.S. at 511 n. 37, 98 S.Ct. at 2913 n. 37, but never explicitly addressed. Nonetheless, it has been suggested that the functional approach established in *Butz* fairly compels the conclusion that a prosecutor is not entitled to absolute immunity for conduct outside of his advocatory role. *See Marrero v. City of Hialeah,* 625 F.2d 499, 506–10 (5th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981).

Without fully embracing the functional lines that lower courts have drawn in deciding when prosecutors are and are not entitled to absolute immunity, the Supreme Court has noted that lower courts have uniformly read *Imbler* not to extend beyond advocatory conduct, *Harlow v. Fitzgerald,* 102 S.Ct. at 2735 n. 16; *see Stepanian v. Addis,* 699 F.2d 1046 (11th Cir.1983); *McSurely v. McClellan,* 697 F.2d 309 (D.C.Cir. 1982) (per curiam); *Taylor v. Kavanagh,* 640 F.2d 450 (2d Cir.1981); *Mancini v. Lester,* 630 F.2d 990 (3d Cir.1980) (per curiam); *Marrero v.*

This court has repeatedly adhered to the principles enunciated in *Imbler* and *Butz*, "confin[ing] absolute prosecutorial immunity to 'quasi-judicial' actions." *McSurley v. McClellan,* 697 F.2d 309, 318 (D.C.Cir.1982) (per curiam).[20] The controlling question under this approach is whether the conduct in question is so closely associated with the judicial process that it can be characterized as advocatory:

[A] prosecutor receives absolute immunity only when he acts as an "advocate," that is, in his role as a participant in the judicial phase of the criminal process. When a prosecutor acts in any other ca-

City of Hialeah, 625 F.2d 499; *Daniels v. Kieser,* 586 F.2d 64 (7th Cir.1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979); *Jacobson v. Rose,* 592 F.2d 515 (9th Cir.1978), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); *Atkins v. Lanning,* 556 F.2d 485 (10th Cir.1977) (per curiam); *Walker v. Cahalan,* 542 F.2d 681 (6th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1647, 52 L.Ed.2d 357 (1977). *But cf. Keating v. Martin,* 638 F.2d 1121 (8th Cir.1980) (per curiam) (prosecutor held absolutely immune for all acts within the scope of his duty).

The Court also has observed that some such functional limitation is implicit in *Butz, Harlow v. Fitzgerald,* 102 S.Ct. at 2735.

**20.** *See also Dellums v. Powell,* 660 F.2d 802, 805 (D.C.Cir.1981) ("In line with its origins, the scope of prosecutorial immunity is limited to performance of 'quasi-judicial' functions."); *United States v. Heldt,* 668 F.2d 1238, 1276 (D.C.Cir.1981) (per curiam) ("Unless the defendant can complain of some action taken by the prosecutor outside of his quasi-judicial capacity, such suit will generally be barred by absolute immunity."), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).

**21.** This court and other courts have frequently employed a rigid advocatory/investigative/administrative trichotomy in analyzing prosecutorial functions. *See McSurely v. McClellan,* 697 F.2d at 318 ("a prosecutor engaged in essentially investigative or administrative functions receives only the lesser protection of qualified immunity"); *see also Dellums v. Powell,* 660 F.2d at 805; *Taylor v. Kavanagh,* 640 F.2d at 452; *Mancini v. Lester,* 630 F.2d at 992–93; *Briggs v. Goodwin,* 569 F.2d 10, 20–21 (D.C.Cir. 1977), *cert. denied,* 437 U.S. 904, 90 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). The functional categories are sometimes limited to an advocatory/investigative dichotomy. *See United States*

pacity, the rationale for absolute immunity dissolves and the prosecutor receives only the lesser, qualified immunity .... *Id.* at 319.[21]

Delineation of the precise scope of protected advocatory conduct beyond the boundaries established in *Imbler* has proved to be exceedingly difficult. Courts are agreed that purely advocatory functions—conduct implicating, as in *Imbler,* solely the initiation and prosecution of criminal trial proceedings—triggers absolute immunity.[22] Although there are a number of decisions holding that activity less closely associated with the judicial phase of criminal proceed-

v. Heldt, 668 F.2d at 1276; *Simons v. Bellinger,* 643 F.2d 774, 779 (D.C.Cir.1980); *Forsyth v. Kleindienst,* 599 F.2d at 1214–15; *Atkins v. Lanning,* 556 F.2d at 488. Whether the division of functions is twofold or threefold, this approach does not always comport with the wide variety of duties engaged in by a prosecutor. We have thus expressed frustration with the rigidity of the analysis, *see Briggs v. Goodwin,* 569 F.2d at 21 ("To some extent, ... assignment of a particular incident to one of several mutually exclusive abstract categories is likely to involve an element of arbitrariness, especially where the incident in question was clearly not envisioned by those who originally designed the classificatory scheme."), as have other courts, *see, e.g., Lee v. Willins,* 617 F.2d 320, 322 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); *Wilkinson v. Ellis,* 484 F.Supp. 1072, 1083 (E.D.Pa.1980). Accordingly, we emphasize that the governing analysis should not be based upon wooden application of functional labels.

**22.** *See, e.g., Taylor v. Kavanagh,* 640 F.2d at 453 (plea bargaining); *Lee v. Willins,* 617 F.2d at 322 (falsification of evidence, subornation of perjury); *Norton v. Liddel,* 620 F.2d 1375, 1379 (10th Cir.1980) (filing information); *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir.1979) (filing information, offering perjured testimony at trial, misconduct in handling appeals); *Miller v. Barilla,* 549 F.2d 648, 649 (9th Cir.1977) (plea bargaining), *overruled in part on other grounds, Polk Cty. v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286, 297 (2d Cir.1976) (same), *cert. dismissed,* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977); *Wilkinson v. Ellis,* 484 F.Supp. at 1082 (falsification of evidence); *Lofland v. Meyers,* 442 F.Supp. 955, 958 (S.D.N.Y.1977) (subornation of perjury, use of illegally seized evidence at trial).

ings should not receive absolute immunity,[23] there is no clear consensus on how to properly characterize all of the various forms of prosecutorial conduct.[24] This lack of a consensus is plainly attributable to an absence of any settled approach to determining when absolute immunity applies.[25]

■ We believe the task of line-drawing where prosecutorial conduct is neither clearly advocatory nor clearly non-advocatory must take as its premise the rationale for absolute immunity: "In defining the scope of an official's absolute privilege," courts should be mindful that "the sphere of protected action must be related closely to the immunity's justifying purposes." *Nixon v. Fitzgerald,* 102 S.Ct. at 2696, 2705 (1982).[26] Hence, with an eye to the rationale for granting the prosecutor absolute immunity when he acts within his advocatory role, we briefly undertake to identify and elaborate on some general considerations for analyzing prosecutorial conduct that falls neither clearly within nor clearly without the scope of *Imbler.*

In examining such conduct, we shall look first to whether it was sufficiently adversarial to evoke strong resentment and thus frequent retaliatory litigation. Perhaps the best measure of this is the *phase of the proceedings* at which the disputed conduct occurs.[27] The prosecutor is far more likely to be the target of vindictive hostility once he has initiated criminal proceedings; in the post-indictment phase of the proceedings, he is generally required to do and say things on the public record that may cast suspicion and ultimately the criminal sanction on some individual. The prosecutor's role in these circumstances is plainly advocatory.

But the phase of the proceedings cannot be dispositive.[28] If the activity at issue occurs prior to indictment or if no indictment is ever returned, the prosecutor's conduct may nevertheless be advocatory. There are several important clues that may indicate whether the prosecutor's role at pre-indictment stages approximates his position after an indictment has been returned. The first is the *particularity of the*

23. *See, e.g., McSurely v. McClellan,* 697 F.2d at 319–20 (participation in illegal search and seizure); *Taylor v. Kavanagh,* 640 F.2d at 452 (participation in illegal search; dicta); *Marrero v. City of Hialeah,* 625 F.2d at 505–06 (participation in illegal search and seizure, making of defamatory remarks to media); *Hampton v. Hanrahan,* 600 F.2d 600, 632–33 (7th Cir.) (participation in planning and execution of illegal police raid, dissemination of prejudicial information to media), *cert. denied,* 446 U.S. 754, 759, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1979) (per curiam); *Walker v. Cahalan,* 542 F.2d at 684–85 (sending of defamatory letter).

24. *Compare Atkins v. Lanning,* 556 F.2d 485 (supervision of police dragnet operation that resulted in plaintiff's illegal arrest held to be advocatory) *with Apton v. Wilson,* 506 F.2d 83 (supervision of police activities resulting in plaintiff's illegal arrest at May Day demonstration held to be non-advocatory); *Heidleberg v. Hammer,* 577 F.2d 429 (7th Cir.1978) (destruction of evidence held to be advocatory) *with Henderson v. Fisher,* 631 F.2d 1115 (3d Cir. 1980) (per curiam) (knowing failure to preserve exculpatory evidence held to be non-advocatory) *and Wilkinson v. Ellis,* 484 F.Supp. 1072 (destruction of evidence held to be non-advocatory); *Daniels v. Kieser,* 586 F.2d 64 (direction of material witness' illegal detention held to be

advocatory) *with Redcross v. County of Rensselaer,* 511 F.Supp. 364 (N.D.N.Y.1981) (direction of material witness' illegal detention held to be non-advocatory).

25. For a description of various approaches that have been devised, see Note, *Supplementing the Functional Test of Prosecutorial Immunity,* 34 Stan.L.Rev. 487, 489–504 (1982) [hereinafter cited as *Supplementing the Functional Test*].

26. *See also* Note, *Supplementing the Functional Test, supra* note 25, at 508–11 (advocating balancing of policy factors underlying absolute prosecutorial immunity in cases where the conduct in question is not "classifiable as normally quasi-judicial or non-quasi-judicial").

27. *See Briggs v. Goodwin,* 569 F.2d at 18 (*Imbler* court was concerned with "claims likely to arise from prosecutorial behavior at or immediately before trial"); *Taylor v. Kavanagh,* 640 F.2d at 452; *Marrero v. City of Hialeah,* 625 F.2d at 505; *Wilkinson v. Ellis,* 484 F.Supp. at 1081.

28. *See Briggs v. Goodwin,* 569 F.2d at 23 ("[T]he timing of prosecutorial action, by itself, is not dispositive of the immunity issue."); *Daniels v. Kieser,* 586 F.2d at 67 n. 5.

*proceedings.*[29] Prosecutorial conduct in the course of an investigation that has focused on a specific target may cast a shadow of public suspicion and thus evoke vindictive reactions no less intense than could be expected from an indicted defendant. Another clue is the *context of the conduct* in question.[30] Activity in the course of judicial or other formal proceedings is likely to involve advocacy directed against some individual or corporation; in these circumstances, the prosecutor can be expected to take an adversarial posture that may well cause antagonism and hostile counter motives. A final clue, albeit somewhat obscure in definition, may be found in the *nature of particular prosecutorial actions or decisions.* Thus, certain actions of the prosecutor may be so closely related to traditional quasi-judicial functions as to suggest an effective adversarial posture.[31] Decisions involving the selection of evidence, for example, must often be calculated to embarrass and discredit; other prosecutorial decisions, involving the prosecutor's inherent discretion in deciding whether to charge and what charges to bring, must by definition be threatening and coercive. *Cf. Goldschmidt v. Patchett,* 686 F.2d 582 (7th Cir.1982) (sending of letter threatening prosecution advocatory because it is "not the sort of activity which could be per-formed by a layman with the same effectiveness that a letter from the prosecutor's office would accomplish").

Second, we shall look to whether there were prosecutorial safeguards to minimize the necessity for civil damage suits. Here too the phase of the proceedings and the context of the conduct are important. At all points after the decision to seek an indictment there is generally close and direct judicial scrutiny of prosecutorial conduct.[32] Whatever the stage of the proceedings, however, conduct outside the courtroom will generally be subject to relatively little monitoring.[33] Pre-indictment prosecutorial conduct is subject to some measure of judicial scrutiny,[34] and investigatory conduct may be subject to the exclusionary sanction at trial or to professional discipline. But these are often hollow and ineffectual remedies. As the relationship between pre-indictment activity and the judicial process becomes more attenuated, the more important it becomes to take into account the adequacy of the available sanctions to deter abuse.[35]

In sum, absolute prosecutorial immunity extends only to advocatory conduct. Beyond initiation of criminal proceedings and presentation of evidence in criminal trials, drawing functional lines between advocatory and non-advocatory conduct becomes

---

**29.** *See Briggs v. Goodwin,* 569 F.2d at 19 ("examples of ... advocate activities [preliminary to the initiation of proceedings] provided by the Supreme Court [in *Imbler*] are instructive for their common focus on a particular criminal proceeding"); *McSurely v. McClellan,* 697 F.2d at 319 ("Advocacy ... excludes activities that are not closely connected to the initiation or conduct of a particular case."); *Simons v. Bellinger,* 643 F.2d at 779–80; Comment, *Section 1983 and the Limits of Prosecutorial Immunity,* 56 Chi.-Kent L.Rev. 1029, 1050 (1980) (drawing distinction between "far-reaching investigation into the activities of a political group" and "investigating a specific crime") [hereinafter cited as *Section 1983*].

**30.** *See Marrero v. City of Hialeah,* 625 F.2d at 505; *Wilkinson v. Ellis,* 484 F.Supp. at 1081.

**31.** *See Taylor v. Kavanagh,* 640 F.2d at 452 (advocatory "activities ... involve decisions of judgment affecting the course of the prosecution"); *Marrero v. City of Hialeah,* 625 F.2d at 508; *Wilkinson v. Ellis,* 484 F.Supp. at 1081.

**32.** *See Apton v. Wilson,* 506 F.2d at 94 (giving as examples of safeguards in the judicial process "the discretion of the grand jury, the procedures of a trial, and the potential sanction of discipline imposed by the court itself").

**33.** *See Marrero v. City of Hialeah,* 625 F.2d at 509.

**34.** *See generally* Holderman, *Preindictment Prosecutorial Conduct in the Federal System,* 71 J.Crim.L. & Criminology 1 (1980).

**35.** The rationale underlying absolute immunity does not require perfect *substitutes* for the remedy of civil damages. *See Briscoe v. La-Hue,* 103 S.Ct. at 1119–21 (rejecting argument that exception to rule of absolute witness immunity should be made in the case of police officer witness because prosecution for perjury so unlikely as to be ineffective substitute for civil damages).

very difficult. We have identified various factors—all tied to the justifying purposes for absolute immunity—to guide that line-drawing task in cases where the scope of the immunity has not been clearly settled. None of these factors alone is intended to be determinative, nor must they always be used in combination. Given the variety of prosecutorial conduct, however, they will provide some indication of whether the rationale, and thus the protection, of absolute immunity applies in any particular case.

## C. *Application of Official Immunity in This Case*

### 1. *Counts One and Two: The Constitutional Claims*

Having considered the nature and scope of the official immunity principles relevant here, we turn to their application. Application of the official immunity doctrine to Gray's constitutional claims requires a functional analysis to determine whether the alleged prosecutorial misconduct is advocatory.[36] Applying the analysis set forth above, we conclude that all conduct before

the various Grand Juries is advocatory and thus entitled to absolute immunity. For any "investigative" conduct antecedent to Grand Jury proceedings, we assume *arguendo* that qualified immunity applies but conclude that this lower level of protection—as a matter of law—bars Gray's suit.

■ (a) *Conduct Before the Grand Juries.* We regard it as settled that presentation of evidence to an indicting Grand Jury falls within the scope of advocatory prosecutorial conduct protected by *Imbler*.[37] Participation in Grand Jury proceedings is a vital and customary part of a prosecutor's duties. At least in those instances where an indictment is returned, it can safely be said that much if not all of a prosecutor's conduct in presenting the evidence to a Grand Jury will reflect traditional advocacy directed to securing an indictment. In such cases, it would be an exercise in futility and patently counter-productive to attempt to separate out elements of conduct that might have involved non-advocatory functions. We therefore hold that the trial

---

**36.** In Part II.C.2. *infra*, we discuss the requirements that an immunized act be discretionary and within the defendant's scope of authority. It is clear that the scope of authority requirement is a prerequisite to any application of official immunity, whatever the level of protection asserted or the nature of the claim involved. *See Briggs v. Goodwin,* 569 F.2d at 15. There appears to be some question, however, whether the requirement of discretion has any relevance where a federal claim is involved. *See id.* at 16 n. 7 (observing that the development of functional analysis in official immunity law has superseded use of the discretionary/ministerial distinction). *But cf. Harlow v. Fitzgerald,* 102 S.Ct. at 2738 (qualified immunity is available to "government officials performing discretionary functions ... insofar as their conduct" does not violate clearly established law). We need not resolve that question, however, since all of the challenged activities here are plainly discretionary. *See* text accompanying note 48 *infra.*

**37.** *See Hampton v. Hanrahan,* 600 F.2d at 632 ("presentation of evidence before the state grand jury ... comprise[s] part of [defendant's] 'quasi-judicial' duties as state prosecutor —'initiating a prosecution and ... presenting the State's case ...'") (quoting *Imbler,* 424 U.S. at 431, 96 S.Ct. at 995); *Slavin v. Curry,*

574 F.2d 1256, 1264 (5th Cir.1978) ("Prosecutorial officials are immune from damage actions performed in the role of a prosecutor .... Thus, [the defendant prosecutor] cannot be liable for damages for his presentation of evidence to the grand jury ...."), *overruled in part on other grounds, Sparks v. Duval Cty. Ranch Co.,* 604 F.2d 976 (5th Cir.1979) (en banc); *Fine v. City of New York,* 529 F.2d 70, 74 (2d Cir.1975) ("It is clear that the presentation of evidence to grand juries is precisely the sort of prosecutorial function ... that the immunity rule is designed to promote."); *Marlowe v. Coakley,* 404 F.2d 70, 70–71 (9th Cir. 1968) (per curiam) ("A prosecuting attorney is immune from civil suits for acts committed in the performance of duties constituting an integral part of the judicial process," and "[a] California district attorney's presentation of evidence to a grand jury is clearly within the scope of his duty to advise and present information to the grand jury .... The function is an 'integral part of the judicial process.'"), *cert. denied,* 395 U.S. 947, 89 S.Ct. 2017, 23 L.Ed.2d 465 (1969). *See also Cerbone v. County of Westchester,* 508 F.Supp. 780, 783 (S.D.N.Y.1981); Comment, *Section 1983, supra* note 29, at 1409; Note, *Immunizing the Investigating Prosecutor: Should the Dishonest Go Free or the Honest Defend?,* 48 FORDHAM L.REV. 1110, 1134–36 (1980).

court was fully justified in concluding that, in the instant case, "the presentation of evidence to the grand jury indisputably is an advocatory function of a prosecutor." 542 F.Supp. at 932.

▇ Gray argues, however, that our decision in *Briggs v. Goodwin,* 569 F.2d 10 (D.C.Cir.1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 51 L.Ed.2d 1133 (1978), dictates a different result. In *Briggs,* a federal prosecutor allegedly perjured himself during a judicial hearing in connection with on-going Grand Jury proceedings. An individual who ultimately was indicted by the Grand Jury subsequently brought a civil suit for damages caused him by the alleged perjury, and the prosecutor's conduct was held to be non-advocatory. Among the reasons given for this result was that the on-going Grand Jury proceedings were investigative in nature; *i.e.,* at the time the prosecutor allegedly perjured himself, the Grand Jury's investigation had not yet focused on any particular suspect and was essentially a broad fact-finding mission.[38]

Likewise, in the present case, Gray argues, the defendants presented evidence to various Grand Juries over a period of two years before the indictment of Gray was returned. Thus, it is said, here too the Grand Jury proceedings represented nothing more than a broad fact-finding mission. At least with respect to conduct before non-indicting Grand Juries, the analogy is not without force. *Briggs* does indeed recognize that some prosecutorial activities during "on-going Grand Jury proceedings" may involve non-advocatory conduct. But insofar as *Briggs* compels close scrutiny of prosecutorial conduct before non-indicting Grand Juries to determine which side of the advocatory/non-advocatory line the conduct falls on, we think the limited principles enunciated there have no application in the present case.

The various factors identified in Part II. B.2. *supra* highlight the crucial distinctions between this case and *Briggs.* First, this case involved focused Grand Jury presentations, *i.e.,* conduct that was sufficiently adversarial to trigger concerns about retaliatory litigation. A pre-indictment investigation, such as the one conducted here, will necessarily have focused on a particular suspect or crime when the prosecutor actually begins presenting evidence of probable cause to a Grand Jury. Any related prosecutorial action before a Grand Jury, moreover, takes place in a formal procedural setting in which the prosecutor's role approximates his role at trial. Although Grand Jury proceedings are *ex parte,* the prosecutor's role in guiding the proceedings—whether or not he has finally decided to seek indictment of the target of Grand Jury inquiry—has a distinctly inquisitorial quality to it. Furthermore, when working with a Grand Jury the prosecutor must exercise delicate judgments in deciding what evidence to seek and present. The complaint in the instant case is perfectly illustrative: the allegations focus on evidentiary omissions, misrepresentations and fabrications with respect to a particular suspect.

Second, in the present case there were procedural safeguards—which Gray in fact availed himself of—to remedy the alleged misconduct in the Government's Grand Jury presentations. Whenever a Grand Jury returns an indictment, the defendant can move to dismiss based on prosecutorial misconduct before the Grand Jury. Many courts have dismissed indictments procured through deliberate presentation of perjured testimony, intentional failure to present exculpatory evidence, and a variety of other

---

**38.** It has not escaped our attention that this aspect of the court's reasoning has met with generally unfavorable comment, *see* Note, *Immunizing the Investigating Prosecutor: Should the Dishonest Go Free or the Honest Defend?, supra* note 37, at 1129–30; Note, *Briggs v. Goodwin: The Constriction of Prosecutorial Immunity,* 15 Hous.L.Rev. 760, 768 (1978);

Note, *Absolute Immunity for Prosecutors; Too Broad a Protection:* Imbler v. Pachtman, 10 SW.U.L.Rev. 305, 327–28 n. 158 (1978), and that the recent decision in *Briscoe v. LaHue,* —— U.S. ——, 103 S.Ct. 1108, 75 L.Ed.2d 96 (granting absolute immunity to police officer witness sued under § 1983), casts some doubt on the court's result.

types of prosecutorial misconduct.[39] We need express no view on the scope of such a remedy in this circuit, except to note that there is no settled rule on its availability to redress the misconduct alleged here. The possibility that the trial court could have decided to dismiss the indictment under these circumstances—which Gray recognized by bringing a motion to dismiss—provides an adequate procedural deterrent against the type of misconduct Gray avers.

In *Briggs,* by contrast, the challenged conduct did not involve actual presentation of evidence to a Grand Jury. Instead, the prosecutor was alleged to have perjured himself in court testimony about an aspect of the on-going investigation. Central to the result in *Briggs* was that the Grand Jury proceedings in that case had been designed as a broad-scale investigation with no focus on any particular suspect.[40] It is true that the prosecutor's misconduct in *Briggs* occurred in the course of formal judicial proceedings; but the prosecutor and the plaintiff had not yet engaged in an adversarial posture,[41] and the court noted that the prosecutor's conduct in testifying involved little or no discretionary judgment.[42] In *Briggs,* moreover, there was evidence demonstrably showing that the only potential safeguards against the alleged misconduct involved were wholly ineffective. The Government argued that criminal and ethical sanctions were sufficient to cure the prosecutor's alleged perjury, but because four and a half years had passed without official inquiry—even by the court before which the perjury was

alleged to have taken place—the prospect of any sanction being invoked was described as "theoretical only." *Briggs,* 569 F.2d at 24. While Gray had access to a remedial process that he himself could and did initiate, the plaintiff in *Briggs* could only stand by and wait for either the court or the prosecutor to reveal and remedy the misconduct that had occurred.

*Briggs v. Goodwin* therefore does not compel the conclusion that the alleged prosecutorial misconduct before non-indicting Grand Juries is entitled to only qualified immunity. The analogy Gray draws between the "investigative" conduct in *Briggs* and the activities that took place in this case has superficial appeal. But we are not content with functional labels that indulge form over substance. On closer examination, the present case, unlike *Briggs,* involves prosecutorial conduct to which the reasons for absolute immunity apply with sufficient force to justify full protection from suit.

(b) *Other Pre-Indictment Conduct.* Gray does not confine his allegations to prosecutorial misconduct in the presentation of evidence to the Grand Juries. He alleges a broad-ranging pre-indictment investigation involving witness interviews and other conduct in developing evidence to present to the Grand Juries. Gross deficiencies in the entire pre-indictment investigation, Gray avers, ultimately caused the alleged deprivation of his Fifth Amendment rights.

We need not labor the question whether absolute or qualified immunity ap-

---

**39.** *See, e.g., United States v. Kennedy,* 564 F.2d 1329 (9th Cir.1977) (knowing presentation of perjured testimony), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978); *United States v. Phillips Petroleum Co.,* 435 F.Supp. 610 (N.D.Okl.1977) (interference with Grand Jury deliberations); *United States v. Braniff Airways, Inc.,* 428 F.Supp. 579 (W.D.Tex.1977) (failure to present exculpatory evidence).

**40.** At the time the prosecutor allegedly perjured himself, he was still engaged in a broad investigation of several individuals and had not yet focused on the particular illegal activity of any one of them. Thus, he "had embarked on what was fundamentally a fact-finding mission, and . . . his false statement to the court, if such

it was, was intended to improve the prospects for that endeavor's success." *Briggs,* 569 F.2d at 24.

**41.** The plaintiff in *Briggs* was not subpoenaed to testify before the Grand Jury until a month after the prosecutor's alleged perjury. Moreover, an indictment was not returned against the plaintiff until four months later.

**42.** The prosecutor's "act of answering a single inquiry from the court, an inquiry which plainly called for a simple affirmative or negative response, might well have been classified as a ministerial, rather than a discretionary, act . . . ." *Briggs,* 569 F.2d at 16 n. 7.

plies to prosecutorial activities in developing evidence to present to a Grand Jury.[43] Because qualified immunity is readily available to protect these activities, we may assume that this less stringent level of immunity applies without considering the applicability of absolute immunity. Under qualified immunity, executive officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.[44] Gray cannot clear the threshold obstacle of demonstrating that the Government prosecutors violated any clearly established constitutional or statutory requirement in conducting their pre-indictment investigation. Some courts have recognized a prosecutorial duty to refrain from deliberately presenting perjured testimony or engaging in other sorts of misconduct before a Grand Jury.[45] But there is no authority whatsoever recognizing a prosecutorial duty to conduct in any particular way investigative or other activities antecedent to Grand Jury proceedings. The trial court thus correctly concluded that any arguable "duty under the Fifth Amendment to conduct a careful, thorough pre-indictment investigation . . . was not clearly established at the time of [the Government's alleged] actions." 542 F.Supp. at 931 n. 5.

### 2. Count Four: The Malicious Prosecution Claim

■ There can be no serious question that the individual defendants are entitled to absolute immunity on Gray's claim of malicious prosecution. In *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1954), the Supreme Court held that absolute immunity is available to federal officials on common law claims arising out of discretionary acts undertaken within the outer perimeter of the officials' authority. Under this rule, it is enough if the official performed an act not "manifestly or palpably beyond his authority" and "having more or less connection with the general matters committed by law to his control or supervision," [46] a test easily satisfied here.[47]

■ The requirement of discretion is just as plainly satisfied. We conclude in Part III. *infra* that all of the alleged activities at issue in this case involve discretionary functions protected under the FTCA. Although the concepts of "discretion" in official immunity law and under the FTCA are not of identical scope, they are similar and may have a common origin.[48] In both areas, the notion of "discretion" is a bench-

---

**43.** Courts have reached differing conclusions on the extent to which evidence-gathering activities preliminary to a Grand Jury presentation should be included within the sphere of protected advocatory conduct. *Compare J.D. Pflaumer, Inc. v. United States Dep't of Justice,* 450 F.Supp. 1125, 1133 (E.D.Pa.1978) ("[T]he gathering of evidence for the purpose of supporting the presentation of an indictment to the grand jury, at least in the context of this case, is more a kin [sic] to the prosecutor's role as an investigator and therefore outside the quasi-judicial phase of his duties.") (relying heavily on *Briggs v. Goodwin*) *with Cook v. Houston Post,* 616 F.2d 791, 793 (5th Cir.1980) (absolute immunity applies to interviewing of witness prior to Grand Jury proceeding because prosecutor was duty-bound to engage in such investigation). *See also* Note, *Delimiting the Scope of Prosecutorial Immunity From Section 1983 Damage Suits,* 52 N.Y.U.L.REV. 173, 199 (1977) ("Because grand jury proceedings, like actual trials, are judicial proceedings, investigations relating to grand jury activities deserve quasi-judicial immunity.") (footnote omitted). This court has recently observed that "preliminary gathering of evidence which may blossom into a potential prosecution" is entitled to only qualified immunity. *McSurely v. McClellan,* 697 F.2d at 320.

**44.** *See* note 8 *supra.*

**45.** *See* note 39 *supra.*

**46.** *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896). *See Briggs v. Goodwin,* 569 F.2d at 15.

**47.** *See Cooper v. O'Connor,* 99 F.2d 135, 138 (D.C.Cir.), *cert. denied,* 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938); *Laughlin v. Garnett,* 138 F.2d 931, 931–32 (D.C.Cir.1943) (per curiam), *cert. denied,* 322 U.S. 738, 64 S.Ct. 1055, 88 L.Ed. 1572 (1944).

**48.** *See Sami v. United States,* 617 F.2d 755, 771 (D.C.Cir.1979).

mark against which to measure whether judicial scrutiny of a disputed official act might inhibit official policymaking and thus unduly interfere with the efficient operation of government. Because we are satisfied that all of the alleged activities cited by Gray fall within the "discretionary function" exception, we are confident that the acts for which official immunity is claimed are "discretionary" as well.

 Gray argues, however, that he does not complain of actual institution of criminal proceedings, but rather of malicious investigative and administrative acts that ultimately led to the institution of proceedings against him. A claim for malicious prosecution will lie, he contends, so long as "a causal connection is established between the acts of the defendant and the decision to prosecute the plaintiff." [49] And where "a claim for malicious prosecution is stated against federal officials and prosecutors for actions taken in their investigatory and administrative roles only," Gray urges, "the traditional rule of absolute immunity in malicious prosecution cases should be replaced with the current rule allowing only qualified immunity for investigative activities." [50] This attempt to distinguish different types of prosecutorial activity is unavailing. It is well settled that the functional analysis governing prosecutorial immunity as against federal claims has no application to common law claims. Whatever the nature of a prosecutor's activity, he may not be sued at common law for discretionary conduct within the outer perimeter of his authority. *Dellums v. Powell,* 660 F.2d

802 (D.C.Cir.1981), cited by Gray, has no application. Because that case involved a constitutional claim,[51] anything said therein that might bear on the proper analysis of prosecutorial function is irrelevant to application of immunity as against a common law claim.

## III. SOVEREIGN IMMUNITY

The United States is protected from unconsented suit under the ancient common law doctrine of sovereign immunity. Prior to enactment of the FTCA, sovereign immunity did not entirely preclude redress for tortious governmental acts, but relegated injured citizens to the onerous process of securing recompense by private bill. In the interest of providing a more efficient means of compensation, the FTCA was enacted as a broad consent to suit for personal injury or death caused by the tortious actions of government employees acting within the scope of their employment under circumstances where a private person would be liable. Balanced against the interest in facilitating private redress, however, was a concern for protecting against unwarranted judicial intrusion into areas of governmental operations and policymaking. Congress thus retained a sovereign immunity from suit in 28 U.S.C. § 2680(a) for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." [52]

---

**49.** Brief for Appellant 46.

**50.** *Id.* at 47–48 (misciting the dissent in *Dellums v. Powell,* 660 F.2d at 808 (Edwards, J.), which did not address immunity rules applicable to common law malicious prosecution claims).

**51.** *See Dellums v. Powell,* 660 F.2d at 804 & n. 6 (noting that issues on appeal related only to claim for malicious prosecution with intent to violate the First Amendment and not to common law claim for malicious prosecution).

**52.** 28 U.S.C. § 2680(a) reads:
The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Only the discretionary function clause of this provision is relevant here. We note, however, that the first part of the statute reflects a similar congressional concern with "protect[ing] the Government from liability that would seriously handicap efficient government opera-

The District Court held that all of Gray's allegations challenge discretionary functions and, accordingly, dismissed his FTCA claim. We uphold the dismissal. Because the obscurity of this area is matched only by its wealth of conclusory analytical labels, wading through the relevant case law is surprisingly difficult. We therefore preface our application of section 2680(a) with a discussion of its proper scope, guided—as we were similarly guided in considering official immunity—by the belief that the reservation of governmental immunity embodied in the exemption should be bounded by its justifying purposes.

A. *The "Investigative or Law Enforcement Officer" Proviso to 28 U.S.C. § 2680(h)*

■ Before proceeding to our review of the applicability of the "discretionary function" exception of 28 U.S.C. § 2680(a), we pause briefly to address the relevance of 28 U.S.C. § 2680(h).[53] Gray argues that all he need show to sustain the malicious prosecution portion of his FTCA claim is that the individual defendants were "investigative or law enforcement officer[s]" within the meaning of section 2680(h). The discretionary function clause, he contends, does not apply to suits authorized by the "investigative or law enforcement officer" proviso of section 2680(h). We reject this construction of the statute.

One district court decision in this circuit suggests that the "discretionary function" exception of section 2680(a) does not apply to suits under the "investigative or law enforcement" proviso of section 2680(h), *see*

*Townsend v. Carmel,* 494 F.Supp. 30, 36–37 (D.D.C.1980), and a panel of this court has expressed uncertainty on the issue, *see Sami v. United States,* 617 F.2d 755, 767–68 (D.C.Cir.1979). However, the plain language of 28 U.S.C. § 2680(a) states that the FTCA's general waiver of sovereign immunity is inapplicable to "*any claim*" based on a discretionary function, *see* note 52 *supra.*

Nearly thirty years after enactment of the FTCA, in the wake of *Bivens v. Six Unknown Named Agents of the FBI,* 403 U.S. 388, 398, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971), Congress added the proviso to section 2680(h), "establishing Federal liability for intentional torts committed by law enforcement authorities." *Townsend v. Carmel,* 494 F.Supp. at 36. Thus, it has been suggested that congressional intent will be defeated if immunity is afforded pursuant to section 2680(a) in suits brought under the proviso to section 2680(h). We are unpersuaded by this argument, both because of the unambiguous language of section 2680(a) and because we can find no serious incongruity between the immunity afforded under section 2680(a) and the waiver of immunity under the proviso to section 2680(h). We therefore reject the contention that intentional tort claims based on the acts of "investigative or law enforcement officer[s]" may never come within the purview of the discretionary function exception to section 2680(a).

It seems clear that the intentional torts listed under the proviso to section 2680(h) may be committed without any exercise of a discretionary function. To this extent, the provisions of section 2680(a) and section

---

tions," *United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963). *See Beins v. United States,* 695 F.2d 591, 611 n. 9 (D.C.Cir.1982) (Robinson, C.J., concurring).

**53.** 28 U.S.C. § 2680(h) provides:
The provisions of this chapter and section 1346(b) of this title shall not apply to—

. . . . .

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* That, with regard to acts or omissions of investiga-

tive or law enforcement officers of the United States Government, the provisions of this chapter and Section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

2680(h) are neither inconsistent nor mutually exclusive. It is true that in some instances—as with a claim of malicious prosecution—the challenged conduct may involve discretionary functions and, thus, be covered by the section 2680(a) exception. However, if the "investigative or law enforcement officer" limitation in section 2680(h) is read to include primarily persons (such as police officers) whose jobs do not typically include discretionary functions, it will be rare that a suit permissible under the proviso to section 2680(h) is barred by section 2680(a).

For the foregoing reasons, and because "statutes which waive [the] immunity of the United States from suit are to be construed strictly in favor of the sovereign," *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 19, 96 L.Ed. 268 (1951), we believe that Gray must clear the "discretionary function" hurdle *and* satisfy the "investigative or law enforcement officer" limitation to sustain the malicious prosecution component of his FTCA claim. Nevertheless, since we hold that all of the activities alleged in the complaint are protected under the discretionary function clause, we need not address whether the individual defendants were "investigative or law enforcement officer[s]."

B. *The Language and Legislative History of 28 U.S.C. § 2680(a)*

Turning now to the meaning of 28 U.S.C. § 2680(a), we first note that the language

of the discretionary function clause discloses virtually nothing about the scope of its protection. Literal adherence to the phrase "discretionary function" leads to blind alleys. Because virtually all decisions in the realm of human experience involve some element of discretion, any interpretation focusing on the plain import of the statutory language would swallow the general waiver of sovereign immunity in the FTCA.[54] But though the literal language of the statute suggests nothing about the scope of the discretionary function exception, the wording of section 2680(a) is nonetheless instructive. Section 2680(a) provides that the FTCA "shall not apply" to claims involving discretionary functions. It is therefore clear that the discretionary function clause *does not of its own force* provide the government protection from suit, but rather preserves a preexisting cloak of governmental immunity for some category of activities.

Examination of the legislative history is only slightly more helpful in divining the scope of protection afforded by section 2680(a). Committee reports on the bill in which section 2680(a) originated suggest that it was meant to preclude claims arising out of certain acts of administrative discretion. Although the reports give a few examples of the types of governmental activities intended to be immunized, nothing further about the nature of administrative discretion is said.[55] The legislative history

---

**54.** *See Payton v. United States,* 679 F.2d 475, 479 (5th Cir. Unit B 1982) (en banc) ("If strictly followed, [the] ... language [of the FTCA] would exempt ... all but the most fortuitous events, for '[u]nless government officials (at no matter what echelon) make their choices by flipping coins, their acts involve discretion in making decisions.'") (quoting *Smith v. United States,* 375 F.2d 243, 246 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967)). *See also J.H. Rutter Rex Mfg. Co. v. United States,* 515 F.2d 97, 99 (5th Cir.1975) (per curiam), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 359 (1976); *Griffin v. United States,* 500 F.2d 1059, 1063–64 (3d Cir. 1974).

**55.** The following text appears repeatedly in committee reports:

This is a highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid. It is also designed to preclude application of the bill to a claim against a regulatory agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved. To take another example, claims based upon an allegedly negli-

does, however, indicate that the discretionary function exception merely reflects a congressional belief that courts would continue to apply preexisting common law doctrine barring claims against discretionary governmental acts.[56]

We can thus glean two general conclusions about the breadth of the discretionary function exception from its language and legislative history. First, Congress plainly intended to preserve immunity for some undefined category of discretionary governmental acts but to abrogate that protection for ordinary, day-to-day acts of governmental negligence. Second, the only indication of how the boundaries of the exception are to be determined within this broad range of activities is that Congress expected courts to refer to preexisting notions of governmental immunity. Reference to such notions—short of wholesale incorporation of them and all of their doc-

trinal casuistries[57]—will therefore be made in an effort to solve the central problem of the discretionary function exception: "articulating and applying a rule that ... allow[s] the Government immunity in those cases where it continues to feel the need."[58]

## C. The Purpose of a Governmental Immunity for Discretionary Acts

Long before its embodiment in the FTCA, the concept of "discretion" acquired a well established common law meaning in suits against government officers. Although the sovereign was totally immune from tort liability, suits for non-monetary relief were regularly permitted through mandamus or injunction actions against agents of the sovereign. To avoid the bar of sovereign immunity, courts indulged the fiction that a remedy could be had against a government officer, even though, in reality, relief would come from the government

gent exercise by the Treasury Department of the blacklisting or freezing powers are also intended to be excepted. The bill is not intended to ... provide a remedy on account of such discretionary acts even though negligently performed and involving an abuse of discretion.... However, the common-law torts of employees of regulatory agencies would be included within the scope of the bill to the same extent as torts of nonregulatory agencies. Thus, ... [the bill is] not intended to exclude such common-law torts as an automobile collision caused by the negligence of an employee of the Treasury Department or other Federal agency administering those functions.

H.R. REP. No. 2245, 77th Cong., 2d Sess. 10 (1942). *See also* S. REP. No. 1196, 77th Cong., 2d Sess. 7 (1942); H.R. REP. No. 1287, 79th Cong., 1st Sess. 5–6 (1946).

56. Then Assistant Attorney General Shea, referring to a prior bill that had contained no similar exception, testified in House hearings that "the cases embraced within [the new] subsection would have been exempted from [the prior bill] by judicial construction. It is not probable that the courts would extend a Tort Claims Act into the realm of the validity of legislation or discretionary administrative action, but H.R. 6463 makes this specific." *Tort Claims: Hearings on H.R. 5373 & H.R. 6463 Before the House Comm. on the Judiciary,* 77th Cong., 2d Sess. 29 (1942).

57. In 1955, the Supreme Court rejected the contention that section 2860(a) should be read to codify the much criticized municipal immunity doctrine distinguishing governmental and nongovernmental acts:

> The fact of the matter is that the theory whereby municipalities are made amenable to liability is an endeavor, however awkward and contradictory, to escape from the basic historical doctrine of sovereign immunity. The Federal Tort Claims Act cuts the ground from under that doctrine; it is not self-defeating by covertly embedding the casuistries of municipal liability for torts.

*Indian Towing Co. v. United States,* 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955). Nevertheless, we find it helpful to keep in mind that the discretionary function exception does not create protection from suit, but rather preserves an immunity that has historically been granted. Although we do not suggest that this requires wholesale adoption of some of the arcane distinctions developed in an attempt to escape from that historic principle prior to the FTCA's general waiver, *see id.* at 65–66, 76 S.Ct. at 124–125 n. 1, we do think reference to the general teachings of common law immunity doctrine can be useful in confining the immunity preserved by the FTCA to its proper scope.

58. Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act,* 57 GEO. L.J. 81, 126 (1968) [hereinafter cited as *The Discretionary Function Exception*].

itself.[59] In such cases, the familiar "ministerial/discretionary" distinction was used to separate permissible actions nominally against the officer from impermissible actions deemed to be against the government. One of the earliest and most well known statements of this principle appears in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), where Chief Justice Marshall ruled that mandamus would lie where an officer "is directed by law to do a certain act . . . affecting the absolute rights of individuals," but not where the issuance of mandamus would require decision of "[q]uestions in their nature political" or inquiry into "how the executive, or executive officers, perform duties in which they have a discretion." *Id.* at 170. As we explain below, the same concern for limiting judicial intrusion into executive and legislative domains underlies the discretionary immunity embodied in the FTCA.

The government's immunity from tort liability traditionally rested on broader justifications. In the early part of this century, however, the doctrine was given increasingly narrow application as the reasons for its existence were gradually discarded. Sover-

eign immunity's two traditional stanchions —"the king can do no wrong," [60] and "there can be no legal right as against the authority that makes the law on which the right depends" [61]—were thoroughly discredited in a series of leading articles by Professor Edwin Borchard.[62] Enacted in the reformist climate initiated by these articles, *see Keifer & Keifer v. RFC,* 306 U.S. 381, 391, 59 S.Ct. 516, 519, 83 L.Ed. 784 (1939) ("the present climate of opinion . . . has brought governmental immunity from suit into disfavor"), the FTCA was one of the earliest efforts in a widely accepted move by courts and legislatures, both state and federal, to "mitigate unjust consequences of sovereign immunity from suit." *Feres v. United States,* 340 U.S. 135, 139, 71 S.Ct. 153, 156, 95 L.Ed. 152 (1950).[63]

But as judicial abrogation and general legislative waiver of the doctrine gained ascendency, only the most zealous detractors of sovereign immunity called for its total abolition. There was a general recognition that the doctrine still had a place in modern jurisprudence despite its association with out-moded absolutist notions of government.[64] "[T]he source of [sovereign

---

**59.** *See, e.g., Minnesota v. Hitchcock,* 185 U.S. 373, 386, 22 S.Ct. 650, 655, 46 L.Ed. 650 (1902). *See generally* Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 HARV.L. REV. 1 (1963); Davis, *Suing the Government by Falsely Pretending to Sue an Officer,* 29 U.CHI. L.REV. 435 (1962).

**60.** Borchard, *Governmental Responsibility in Tort,* 36 YALE L.J. 1, 39–40 (1926–27) ("It is not open to doubt that notwithstanding the denial by many courts that the maxim, 'the king can do no wrong,' has any application in the United States, it has nevertheless furnished the real explanation why exemption of the government, state and federal, from liability in tort has become an apparent axiom of American law.") [hereinafter cited as *Governmental Responsibility in Tort*]. *See Langford v. United States,* 101 U.S. 341, 342–46, 25 L.Ed. 1010 (1879).

**61.** *The Western Maid,* 257 U.S. 419, 433, 42 S.Ct. 159, 161, 66 L.Ed. 299 (1922) (Holmes, J.); *Kawananakoa v. Polyblank,* 205 U.S. 349, 353, 27 S.Ct. 526, 531, 51 L.Ed. 834 (1907) (Holmes, J.).

**62.** Borchard, *Governmental Responsibility in Tort, supra* note 60, at 17–41 (criticizing the theory that "the king can do no wrong"); *id.*

757, 757–807 (criticizing Justice Holmes' theory that the state cannot be bound by law). *See also id.* 1039; Borchard, *Government Liability in Tort,* 34 YALE L.J. 1 (1924–25); *id.* 129; *id.* 229; Borchard, *Governmental Responsibility in Tort,* 28 COLUM.L.REV. 577 (1928); Borchard, *Theories of Governmental Responsibility in Tort,* 28 COLUM.L.REV. 734 (1928).

**63.** For a review of the movement toward government responsibility, see 3 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 25.01–.17, at 434–505 (1958).

**64.** In concluding a summary of legislative and judicial developments, for example, Professor Davis qualified his ringing endorsement of the trend toward abolition of immunity with the remarks:

[T]his is far from saying that governmental units should be liable for all private losses they cause. Most such losses, as now, will have to be regarded as a part of the necessary price for the benefits of living in organized society. Nearly all policy determination —legislative, executive, judicial, or administrative—hurts someone. The losses caused by policy choices are usually well spread, and

immunity's] ... continuing vitality where the royal privilege no longer exists," Justice Stone declared in 1938, "is to be found in the public policy now underlying the rule even though it may in the beginning have had a different policy basis." *Guaranty Trust Co. v. United States,* 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224 (1938).

The modern policy basis justifying sovereign immunity from suit has three principal themes. First, and most important, under traditional principles of separation of powers, courts should refrain from reviewing or judging the propriety of the policymaking acts of coordinate branches.[65] Second, consistent with the related doctrine of official immunity, courts should not subject the sovereign to liability where doing so would inhibit vigorous decisionmaking by government policymakers.[66] Third, in the interest of preserving public revenues and property, courts should be wary of creating huge and unpredictable governmental liabilities by exposing the sovereign to damage claims for broad policy decisions that necessarily impact large numbers of people.[67] Framed in different fashions, each of these themes appears again and again, alone or in combination, as a modern justification for retaining a form of immunity, under the general rationale that courts should not "interfere" with government operations and policymaking.

### D. The Case Law Interpretation of the Discretionary Function Exception

■■■ We now turn to the case law interpretation of section 2680(a)'s scope. As will become clear, courts have gradually devel-

---

even when they are not ... the governmental unit should [sometimes] be immune from liability ....

*Id.* at § 25.17, 504–05. *See also* Note, *Separation of Powers and the Discretionary Function Exception: Political Question in Tort Litigation Against the Government,* 56 Iowa L.Rev. 930, 935 n. 24 (1971) ("Only after policy-makers were willing to confront the bald question of how much liability governments could accept short of ineffectuality and financial suicide was the real issue joined. It is at this level that most of the debate over immunity continues.") [hereinafter cited as *Separation of Powers*].

**65.** Separation of powers became relevant to the law of sovereign immunity only after courts themselves began to abrogate the doctrine. It was suggested that separation of powers considerations counseled in favor of legislative solutions to the problem of government immunity; otherwise, judicial abrogation of the doctrine would "leave in the hands of the judiciary the responsibility for balancing policy considerations and striking a practical solution to issues which are essentially political in nature and thus particularly within the competence and experience of legislatures." Van Alstyne, *Governmental Tort Liability: A Public Policy Prospectus,* 10 U.C.L.A. L.Rev. 463, 466 (1963). *See also* James, *Tort Liability of Governmental Units and Their Officers,* 22 U.Chi.L.Rev. 610, 615 (1955); Note, *Separation of Powers, supra* note 64, at 946–50.

**66.** *Elgin v. District of Columbia,* 337 F.2d 152, 155 (D.C.Cir.1964); Reynolds, *The Discretionary Function Exception, supra* note 58, at 121. The argument that suits against government should be barred because of their potential inhibiting effect on governmental decisionmaking has long been advanced as a policy basis for sovereign immunity. *See The Siren,* 74 U.S. 152, 154, 19 L.Ed. 129 (1868); *Briggs v. Light Boats,* 11 Allen 157, 162 (Mass.1865). Despite this history, however, inhibition of vigorous governmental decisionmaking is clearly less of a concern in governmental immunity law than in official immunity law. *See Owen v. City of Independence,* 445 U.S. 622, 655–56, 100 S.Ct. 1398, 1417–18, 63 L.Ed.2d 673 (1980) (the argument "that the threat of *personal* monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official's decisiveness and distorting his judgment on matters of public policy[,] ... is [less forceful] ... when the threat of personal liability is removed").

**67.** *See* Schwartz, *Public Tort Liability in France,* 29 N.Y.U. L.Rev. 1432, 1458 (1954); Note, *Separation of Powers, supra* note 64, at 935 & n. 25. Fear that enormous liabilities might threaten public solvency has traditionally been cited as a justification for state sovereign immunity under the Eleventh Amendment, *see Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 405, 5 L.Ed. 257 (1821), and common law municipal immunity, *see Russell v. Men of Devon,* 100 Eng.Rep. 359 (K.B.1788). It may have less force as a justification for federal sovereign immunity. *See Rayonier, Inc. v. United States,* 352 U.S. 315, 320, 77 S.Ct. 374, 377, 1 L.Ed.2d 354 (1956) ("[F]or obvious reasons the United States cannot be equated with a municipality, which conceivably might be rendered bankrupt if it were subject to [huge] liability for the negligence of its [employees] ....").

oped a functional approach to the statute that—consistent with common law principles embodied within it—permits immunity only where interference with the conduct of government is threatened.

The seminal Supreme Court case on the discretionary function exception is *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). *Dalehite* involved an FTCA action for personal injuries and deaths arising from a cataclysmic explosion in Texas City, Texas, of nitrate fertilizers manufactured by the government for shipment to occupied Europe. Damages were sought for alleged negligence in drafting and adopting the fertilizer export plan, manufacturing the fertilizer, and supervising dockside loading. The Supreme Court denied all liability, ruling each of these activities to be a protected discretionary function.

The Court began its construction of the discretionary function exception with a reminder that sovereign immunity remains a vital principle subject to abrogation only by clear legislative statement. After examining the legislative history of section 2680(a), the Court noted that the statute protects "the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law." *Id.* at 34, 73 S.Ct. at 967. But the Court did not attempt a precise definition of the boundaries of the concept of discretion in light of this ancestry, preferring to say only that:

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also

includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion.

*Id.* at 35–36, 73 S.Ct. at 967–968 (footnote omitted). The broad suggestion that "where there is room for policy judgment and decision there is discretion" was limited with an analysis aimed principally at the level of the decisionmaker. "That the cabinet-level decision to institute the fertilizer program was a discretionary act is not seriously disputed," the Court observed. *Id.* at 37, 73 S.Ct. at 969. And because all of the decisions executing that initial determination "were ... responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program," *id.* at 42, 73 S.Ct. at 971, they too were ruled to be discretionary acts.[68]

This court's early application of the discretionary function exception used the planning/operational distinction of *Dalehite,* but, at the same time, took care to relate that distinction to its common law origins. In *Eastern Airlines, Inc. v. Union Trust Co.,* 221 F.2d 62 (D.C.Cir.), *aff'd sub nom. United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955), for example, we found the negligence of air traffic controllers in causing an aircraft disaster to be actionable "operational" activity. The question for decision was framed as whether the activities alleged fell within the " 'historic principle that the courts will not, in private action, revise or review executive conduct involving the exercise of judgment or discretion of a public character.' " *Id.* at 74 (quoting, without citation, contention of the United States). Noting that *Dalehite's*

---

**68.** *Dalehite* remains the Supreme Court's only full-dress pronouncement on the discretionary function exception. The exception came up indirectly or was relevant for its absence in a spate of cases following immediately in *Dalehite's* wake, *see Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; *Hatahley v. United States,* 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); *Rayonier, Inc.*

*v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354; *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805, none of which contributed significantly to interpretation of the statute's proper scope. The task of fully expounding the meaning of the discretionary function clause has thus devolved on the lower federal courts.

distinction "between non-actionable planning and actionable negligence in carrying out the plan" could be traced to this principle, *id.* at 77, the court observed that a similar line had traditionally been drawn between discretionary decisions " 'involving the exercise of deliberate judgment and large discretion . . . and depending upon considerations affecting the public health and general convenience throughout an extensive territory,' " and " 'simply ministerial duties' " involving implementation " 'according to the general plan so adopted.' " *Id.* at 78 (quoting *Johnston v. District of Columbia,* 118 U.S. 19, 21, 6 S.Ct. 923, 924, 30 L.Ed. 75 (1886)). The court then upheld a finding of liability, concluding that the activities alleged "were not 'decisions responsibly made at the planning level' and did not involve any considerations important to the practicability of the Government's program of controlling air traffic at public airports." 221 F.2d at 78.

More recent decisions by this court and other lower federal courts under the discretionary function exception have gradually dispensed with strict application of the operational/planning distinction. In its place has emerged a functional approach focusing on "the nature and quality of the discretion involved in the acts complained of." *Smith v. United States,* 375 F.2d 243, 246 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).[69] One discernible theme in these recent decisions is to "hold[ ] the government responsible for any negligent execution of admittedly discretionary policy judgments where the decisions required for the execution did not themselves involve the balancing of policy factors." *Sami v. United States,* 617 F.2d 755, 766

(D.C.Cir.1979).[70] Government decisions will thus be protected only if they are "fraught with foreign relations or other public policy considerations." *Id.* at 767. The aim of the analysis, consonant with common law principles embodied in the statute, is to preserve an immunity broad enough to " 'prevent[ ] tort actions from becoming a vehicle for judicial interference" with the conduct of government. *Id.* at 766 (quoting *Blessing v. United States,* 447 F.Supp. 1160, 1170 (E.D.Pa.1978)).

E. *Application of the Discretionary Function Exception In This Case*

 It is plain that Gray's FTCA claim was properly dismissed insofar as it incorporates the malicious prosecution claim and thus challenges the actual decision to institute prosecution against him. Prosecutorial decisions as to whether, when and against whom to initiate prosecution are quintessential examples of governmental discretion in enforcing the criminal law, and, accordingly, courts have uniformly found them to be immune under the discretionary function exception.[71]

The separation of powers concerns justifying governmental immunity in this area were forcefully expressed by the Fifth Circuit in *Smith v. United States,* 375 F.2d 243. First, prosecutorial discretion is exercised pursuant to expansive constitutional and statutory authority delegated to the executive. The President of the United States is charged in article 2, section 3, of the Constitution with the duty to "take Care that the Laws be faithfully executed," the Attorney General is the President's surrogate in the prosecution of all offenses against the Unit-

**69.** *See Sami v. United States,* 617 F.2d at 766–67; *First Nat'l Bank in Albuquerque v. United States,* 552 F.2d 370, 374–77 (10th Cir.), *cert. denied,* 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977); *Downs v. United States,* 522 F.2d 990, 997 (6th Cir.1975); *J.H. Rutter Rex Mfg. Co. v. United States,* 515 F.2d at 99; *Griffin v. United States,* 500 F.2d at 1064; *Hendry v. United States,* 418 F.2d 774, 780–83 (2d Cir. 1969).

**70.** *See also Harr v. United States,* 705 F.2d 500, 505 (D.C.Cir.1983); *Beins v. United States,* 695

F.2d 591, 600–05 (D.C.Cir.1982); *Hitchcock v. United States,* 665 F.2d 354, 363 (D.C.Cir.1981).

**71.** *See Redmond v. United States,* 518 F.2d 811 (7th Cir.1975); *Accardi v. United States,* 435 F.2d 1239 (3d Cir.1970); *Smith v. United States,* 375 F.2d 243; *United States v. Faneca,* 332 F.2d 872 (5th Cir.1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965); *Brooks v. United States,* 152 F.Supp. 535 (S.D. N.Y.1957).

ed States, and each Assistant Attorney General is the delegate of the Attorney General in exercising this broad well-spring of enforcement authority. *See Smith v. United States*, 375 F.2d at 246–47. Second, each individual decision whether or not to initiate prosecution is part of a national enforcement policy and involves the weighing of competing resources and priorities. "The federal government's decisions concerning enforcement of its criminal statutes comprise a part of its pursuit of national policy. If the government could be held liable for prosecuting or failing to prosecute [a particular] ... case, its choices in [an entire] area ... could quite conceivably be affected by ... a [private] suit. Thus, a policy decision of the federal government might be influenced by a plaintiff with no governmental responsibility." *Id.* at 247. Finally, the prosecutor's decision whether or not to initiate prosecution has historically been subject to little or no judicial scrutiny and is not readily amenable to evaluation by courts. "The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute." *Id.*

Gray contends that the concerns expressed in *Smith v. United States* do not apply here because the challenged prosecutorial decision in that case was central to national civil rights policy. "The [prosecutors] ... in *Smith* had to decide whether to prosecute black civil rights activists for al-

leged illegalities in their boycotting and picketing of a white merchant." Reply Brief for Appellant 20. "No such complex issues of political responsibility are involved in the instant case," Gray observes. *Id.* at 21. We do not think the separation of powers concerns articulated in *Smith* may be read so narrowly. Given the nature of the discretion inherent in any prosecutorial decision to initiate proceedings, it is clear that judicial review in tort suits would—at some point—trench on the traditional boundaries of separation of powers. The test suggested by Gray, focusing on "complex issues of political responsibility," is both impractical and plainly at odds with the underlying purpose of the discretionary function exception. We think there can be no serious question over the applicability of the discretionary function exception to the decision to initiate prosecution.[72]

Disposition of the remaining portions of Gray's FTCA claim is only slightly more problematic. These portions of Gray's FTCA claim incorporate the allegations of Counts One and Two of the complaint, both of which rest on constitutional tort theories under the Grand Jury and Due Process clauses of the Fifth Amendment. Because the FTCA's general waiver of immunity extends only to acts or omissions that would be tortious under state law, there is a question whether constitutional torts that do not also constitute torts under state law are cognizable under the FTCA.[73] We do not

**72.** In some areas of governmental function where the applicability of the rationale for sovereign immunity is less clear, this court and other courts often undertake close, case-by-case scrutiny of the particular decision at issue to determine whether it involved the weighing of policy factors. *See, e.g., Harr v. United States,* at 504–506; *Beins v. United States,* 695 F.2d at 602–05; *Griffin v. United States,* 500 F.2d at 1067–69; *Hendry v. United States,* 418 F.2d at 783 (all involving medical or scientific decisionmaking). But other "areas of governmental activity are, by their very nature, likely to involve policy-weighing and so will be found discretionary almost as a routine." *Blessing v. United States,* 447 F.Supp. 1160, 1181 n. 29 (E.D.Pa.1978).

**73.** *See* 28 U.S.C. § 1346(b). In a case that arose prior to 1974, the Second Circuit held

that constitutional torts are not cognizable under the FTCA for this reason. *See Birnbaum v. United States,* 588 F.2d 319, 327–28 (2d Cir. 1978). The "investigative or law enforcement officer" proviso of § 2680(h), enacted in 1974, may now compel a different conclusion. *See Norton v. United States,* 581 F.2d 390, 395 (4th Cir.) ("[T]he legislative history [of the 1974 proviso] makes clear that the federal government may be sued for *Bivens* torts committed by its agents ...."), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 678 (1978). Commentators are divided on the question. *Compare* Schuck, *Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages,* 1980 Sup.Ct.Rev. 281, 356–57 *and* Bell, *Proposed Amendment to the Federal Tort Claims Act,* 16 Harv.J. on Legis. 1, 4–5 (1979) *with* Boger, Gitenstein & Verkuil, *The Federal Tort Claims Act Intentional Torts*

resolve that issue, however, because it was neither addressed below nor briefed before this court.[74]

■ Even assuming Gray's allegations of illegal preindictment conduct are cognizable under the FTCA, they too are barred under the discretionary function clause. Gray contends that he "is not complaining of the initial decision which may have been made by one or more of the defendants to conduct a broad scale investigation of the FBI [, but, rather,] of the improper, tortious, and constitutionally defective manner in which that investigation was carried out." Brief for Appellant 41. There is, indeed, much validity to the distinction between routine execution of discretionary decisions and discretionary decisions themselves,[75] with the discretionary function exception of the FTCA immunizing the latter but not the former. But this presupposes that the implementing activities in any particular case are sufficiently separable from the purely discretionary decisions to which they are related. In an area of governmental functions, such as those involving decisions of a prosecutor, where courts traditionally have been quick to find immunizing discretion, we must examine carefully the allegations made to determine whether they are sufficiently separable from protected discretionary decisions. If such separability exists, then the conduct of the prosecutor may be actionable under the FTCA.

Although the decision whether or not to prosecute clearly falls within the FTCA's discretionary function clause, other prosecutorial actions that directly relate to this fundamental policy decision are not so easily characterized. Indeed, there can be cases where conduct of the prosecutor prior to, or even after, the initiation of Grand Jury proceedings is removed sufficiently from the decision to prosecute so that the discretionary function clause would not provide any protection. For example, participation by prosecutors in illegal searches and seizures during the course of an investigation, or the dissemination of defamatory information to the media, easily could be disassociated from the discretionary decision to prosecute. *Cf.* note 23 *supra* (citing cases). Disassociating such activities from protected prosecutorial decisions is relatively simple because the harm alleged in such cases is distinct from the harm caused by the ultimate prosecution itself. Without delving further into specific factual situations not now before us, we can only suggest that application of the FTCA's discretionary function clause to actions taken by prosecutors will continue to evolve on a case-by-case basis.

In the present case, the improper and tortious actions allegedly undertaken by the defendants are too intertwined with purely discretionary decisions of the prosecutors to be sufficiently separated from the initial

*Amendment: An Interpretive Analysis,* 54 N.C.L.REV. 497, 521–23 (1976).

**74.** Nor do we resolve the interrelated question whether the Government may raise the official immunity defenses of its employees in constitutional tort cases. *See Norton v. United States,* 581 F.2d at 393 (ruling that the United States may assert all defenses available to its agents, including official immunity defenses, in *Bivens* actions). *But see Townsend v. Carmel,* 494 F.Supp. at 36–37 (ruling that the United States may not assert the official immunity defenses of its agents, but observing in dicta that the result would be different if § 2680(a) were applicable to cases under the "investigative or law enforcement officer" proviso).

**75.** This distinction is traceable to the common law of municipal immunity. We first recognized its validity as a guide to application of

the discretionary function exception in *Eastern Airlines, Inc. v. Union Trust Co.,* 221 F.2d 62, 77–78 (D.C.Cir.), *aff'd sub nom. United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955). As the law has developed, more recently some courts have drawn a distinction between "policy formulation" and "rule application." *See, e.g., Hendry v. United States,* 418 F.2d at 782; *Duncan v. United States,* 355 F.Supp. 1167, 1170 (D.D.C.1973). The importance of the distinction is not in the terminology used, however, but in the focus on the nature of the decisionmaking discretion involved. Thus, whatever terms are used, the result is the same: routine decisions that do not involve the actual weighing of policy factors are not accorded immunity, even though they may involve a measure of judgment.

decision to prosecute. Taking the facts as alleged in the complaint, we note that each allegation of improper investigatory conduct is inextricably tied to the decision to prosecute and the presentation of evidence to the Grand Jury. In this case, there is no meaningful way in which the allegedly negligent investigatory acts could be considered apart from the totality of the prosecution. Indeed, the gist of Gray's complaint focuses on alleged causal links between the negligent investigation, the presentation of false and misleading evidence, and the ultimate prosecution. Separating allegations in the complaint that focus on the investigation from the ultimate prosecution merely would elevate the form of Gray's complaint over its essence. Accordingly, although plaintiffs in other cases might allege prosecutorial misdeeds in investigating and presenting evidence to various Grand Juries that, if analyzed discretely, could be viewed as nondiscretionary, we think that the conduct as alleged in this case is insufficiently separable from the discretionary decision to initiate prosecution and therefore cannot by itself support suit under the FTCA.

*Payton v. United States,* 679 F.2d 475 (5th Cir. Unit B 1982) (en banc), involved a similar situation. In that case the plaintiff brought a wrongful death suit against federal parole authorities for a murder perpetrated by a psychotic federal parolee. The parole release determination was held to be a discretionary function, but the plaintiff drew his complaint—as Gray has done here—in disaggregative fashion, challenging the Parole Board's "ministerial" failure to acquire and examine certain records prior to making the parole decision. The court nevertheless dismissed all of the allegations, explaining that the plaintiff's challenge to the "ministerial" omissions

implicates the discretionary function of the Board. To withstand a motion to dismiss, an allegation challenging the Board's performance of any ministerial act must be sufficiently distinguishable from a complaint disputing the Board's exercise of its discretionary function. The plaintiff must therefore allege that the Board breached a duty sufficiently separable from the decision-making function to be nondiscretionary and outside of the exception.

*Id.* at 482.

▮ The same reasoning applies here. We will not permit a suit for damages occasioned by activities that are not meaningfully separable from a protected discretionary function. We thus hold that section 2680(a) "exempts the government from liability for exercising the discretion inherent in the prosecutorial function of the Attorney General, no matter whether [the challenged] decisions are made during the investigation or prosecution of offenses." *Smith v. United States,* 375 F.2d at 248.

### IV. CONCLUSION

For the foregoing reasons, the District Court's dismissal of the amended complaint is

*Affirmed.*