Leon SLOAN and Jimmie Lee
Furby, Appellants,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVEL-
OPMENT, Appellee.

No. 99–5145.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 2000.

Decided Feb. 2, 2001.

James K. Kearney argued the cause for appellants. With him on the briefs were James P. Gallatin, Jr., David T. Hickey, and Andrew J. Hungerman IV.

Scott S. Harris, Assistant United States Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, United States Attorney, and R. Craig Lawrence, Assistant United States Attorney.

Before: EDWARDS, Chief Judge, HENDERSON and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Plaintiffs Leon Sloan and Jimmie Lee Furby appeal from the dismissal of their Federal Tort Claims Act (FTCA) complaint against the United States Department of Housing and Urban Development (HUD). We find that, in light of the discretionary function exception to the FTCA, the district court properly concluded that it lacked jurisdiction to entertain plaintiffs' complaint.

I

Sloan and Furby were partners in a contracting business, J&L Renovation Company (J&L). In 1993, J&L won a subcontract for interior demolition as part

of the rehabilitation of Burns Heights, a public housing project located in Duquesne, Pennsylvania, and owned by the Allegheny County Housing Authority (ACHA). HUD provided ACHA with funds for the project.

HUD's Office of Inspector General (OIG) began to investigate the Burns Heights project in late 1994, after another contractor alleged that J&L was not complying with lead-based paint abatement requirements. OIG auditor Mark Chandler was assigned to conduct a performance audit of the project. In November 1994, Chandler and HUD attorney Dane Narode visited Burns Heights and observed demolition techniques that would have been unacceptable in a project involving lead-based paint—including the failure to contain dirt, dust, and paint chips. Chandler and Narode also visited a landfill, situated about 300 feet from the Monongahela River, where J&L had been taking plaster debris from Burns Heights. The landfill was not approved for the dumping of plaster, as then-applicable Pennsylvania regulations required; moreover, had the plaster been contaminated with lead paint, its dumping would have created a health hazard. When the operator of the landfill discovered the investigators, he chased them off the site and allegedly threatened to "blow [Narode's] head off." During a subsequent visit to the site, the investigators observed the operator burying the debris.

Chandler then interviewed David McLean, Director of Maintenance and Development for ACHA, who told Chandler that Burns Heights was a lead-based paint abatement project. ACHA's records, however, indicate that McLean was mistaken. Those records reflect that in 1992–93, several tests had been performed to determine the lead content of debris and air at Burns Heights; the tests indicated the absence of hazardous lead levels. The records further reflect that after receiving those test results in 1993, ACHA agreed that there was no need for its contractors and subcontractors to follow hazardous lead-based paint protocols at Burns Heights or to dispose of demolition debris as contaminated waste.

Although ACHA provided Chandler with copies of the lead tests, Chandler was not qualified to interpret the results. Nor did he further inquire as to their meaning or speak with J&L regarding the scope of work under the demolition subcontract. Chandler's final audit report, which was issued by the OIG in October 1995, found that ACHA had not ensured compliance with lead-based paint abatement requirements during the interior demolition of the Burns Heights buildings. The report did not mention any contractors or subcontractors by name. OIG, HUD, REPORT No. 96–AO–209–1804, REVIEW OF CONTRACTED LEAD-BASED PAINT ACTIVITIES: ACHA, PITTSBURGH, PA (1995) [hereinafter AUDIT REPORT].

On August 18, 1995, before completing the audit, HUD notified Sloan, Furby, and J&L that it was suspending them from all HUD-related government contracting work, pending further proceedings that might debar them from such work for five years. The notice, issued by HUD's Assistant Secretary for Public and Indian Housing, based the suspension and proposed debarment on three "serious irregularities in [J&L's] business dealings with the government":

1. Improper cleanup of waste from the lead-based paint abatement process;

2. Improper disposal of construction debris from the demolition work; [and]

3. Failure to adhere to contract requirements or HUD guidelines with respect to ... hazardous waste....

Letter from Asst. Sec'y Joseph Shuldiner to Leon Sloan, Sr. (Aug. 18, 1995).

Sloan and Furby invoked their right to an administrative hearing to contest these charges. During the proceeding, the government withdrew the third charge as unsupported by the evidence, and the Administrative Law Judge (ALJ) dismissed the first for the same reason. *In re Sloan,*

HUDBCA No. 96–C–106–D3, at 11–12 (Aug. 30, 1996), 1996 WL 506267. The ALJ upheld the second charge, although she did so only because J&L had dumped the debris in an unapproved site, and not because it posed an environmental hazard. Because she found no environmental hazard, the ALJ rejected HUD's request for debarment and terminated the suspensions. *Id.* at 12–13. She declined, however, to grant plaintiffs' request to void the suspensions *ab initio. Id.* at 14. The Secretary of HUD affirmed the ALJ's decision. *In re Sloan,* HUDBCA No. 96–C–106–D3 (Dec. 18, 1996).

Thereafter, Sloan and Furby filed complaints in the district court, seeking injunctive and declaratory relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 702–03, and damages for constitutional torts under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Those actions were consolidated and subsequently dismissed by the district court. On appeal, this court affirmed the dismissal of the *Bivens* claim (on grounds other than those relied upon by the district judge), but reversed HUD's refusal to void the suspensions *ab initio* as arbitrary and capricious under the APA. *Sloan v. Dep't of Hous. & Urban Dev.,* 231 F.3d 10, 12 (D.C.Cir.2000).

On May 13, 1998, Sloan and Furby filed a separate action for money damages under the FTCA, 28 U.S.C. §§ 1346(b), 2671 *et seq.,* alleging that HUD had negligently conducted the audit of Burns Heights. According to the complaint, HUD's investigation was conducted in a manner that violated the laws and professional standards governing auditors, and that amounted to negligence and professional malpractice under District of Columbia law. HUD moved to dismiss, asserting that the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), deprived the court of subject matter jurisdiction. The district court agreed and granted the motion.

## II

On appeal, we review the dismissal of the plaintiffs' FTCA complaint de novo, *Moore v. Valder,* 65 F.3d 189, 196 (D.C.Cir.1995), and "accept all of the factual allegations in [the] complaint as true," *United States v. Gaubert,* 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting *Berkovitz v. United States,* 486 U.S. 531, 540, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). The FTCA grants federal district courts jurisdiction over claims arising from certain torts committed by federal employees in the scope of their employment, and waives the government's sovereign immunity from such claims. 28 U.S.C. §§ 1346(b), 2674. The grant of jurisdiction and waiver of immunity are subject to a number of express exceptions. *See* 28 U.S.C. § 2680. The exception at issue here, the discretionary function exception, is for "any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If the discretionary function exception applies, the district court lacks subject matter jurisdiction over the case. *See Cope v. Scott,* 45 F.3d 445, 448 (D.C.Cir.1995).

In *United States v. Gaubert,* the Supreme Court set forth a two-part test for determining whether a challenged government action is protected as a discretionary function. First, the exception "covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.'" *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267 (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954). This "requirement of judgment or choice is not satisfied if a 'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow.'" *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267 (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954).

Second, even if "the challenged conduct involves an element of judgment," that judgment must be "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23, 111 S.Ct. 1267 (quoting *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954). Because the exception was designed to " 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort,' " the Court concluded that "the exception 'protects only governmental actions and decisions based on considerations of public policy.' " *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267 (quoting *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954).

## III

In the district court, Sloan and Furby argued that neither HUD's investigation, nor its decision to suspend plaintiffs from government contract work, is a discretionary act exempt from challenge under the FTCA. On appeal, plaintiffs no longer press the latter argument, apparently conceding that the decision to suspend is covered by the discretionary function exception. Appellants' Br. at 28. We have no doubt that it is, but discuss the suspension in some detail because it is relevant to our analysis of the status of HUD's investigation, set forth in Part IV below.

The decision to initiate a prosecution has long been regarded as a classic discretionary function. *See, e.g., Moore*, 65 F.3d at 197 ("[A]ctions that require the prosecutor to exercise his professional judgment ... are ... quintessentially discretionary."); *Gray v. Bell*, 712 F.2d 490, 513 (D.C.Cir.1983) ("Prosecutorial decisions as to whether, when and against whom to initiate prosecution are quintessential examples of government discretion ...."); *General Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998). In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court held that "agency officials performing certain functions analogous to those of a prosecutor should," like prosecutors, "be able to claim absolute immunity" from suits brought under the Constitution. *Id.* at 515, 98 S.Ct. 2894. In language equally applicable to suits brought under the FTCA, the Court said:

> The decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought.

*Id.* HUD's decision to suspend plaintiffs, which began a course of administrative proceedings regarding possible debarment, *see* 24 C.F.R. § 24.411(e), falls well within this rubric.

That HUD's suspension of plaintiffs is protected by the discretionary function exception is confirmed by application of *Gaubert*'s two-part test. First, the decision to suspend is plainly discretionary in nature, involving "an element of judgment or choice." *Gaubert*, 499 U.S. at 322, 111 S.Ct. 1267. Indeed, the applicable regulation expressly so states. *See* 24 C.F.R. § 24.115 ("Debarment and suspension are discretionary actions ...."). Although HUD rules require that certain conditions be met before a suspension may issue, *see* 24 C.F.R. § 24.400(b) (stating that suspension may be imposed only when there is "adequate evidence" of specified wrongdoing and when "[i]mmediate action is necessary to protect the public interest"), that requirement does not convert the decision into a nondiscretionary act. Determining whether those broadly stated conditions exist involves substantial elements of judgment. *See* 24 C.F.R. § 24.400(c) ("In assessing the adequacy of the evidence, the agency should consider how much information is available, how credible it is given the circumstances, whether or not important allegations are corroborated, and what inferences can reasonably be drawn as a result."); *cf. Gaubert*, 499 U.S. at 329,

111 S.Ct. 1267 (holding that Federal Home Loan Bank Board had discretion regarding appointment of receiver notwithstanding that governing statute "enumerated specific grounds warranting an appointment," because "the determination of whether any of these grounds existed depended upon the opinion of the Board" (internal quotation omitted)).

The HUD regulation's express delegation of discretion to the suspending official may also, alone, satisfy *Gaubert*'s second requirement—that the challenged action be based on considerations of public policy. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion," *Gaubert* held, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." 499 U.S. at 324, 111 S.Ct. 1267. But it is hardly necessary to rely on such a presumption here. HUD's regulations place public policy at the forefront of the decision of the suspending official. The official must determine, for example, whether the contractor's violations are "so serious as to affect the integrity of an agency program," 24 C.F.R. § 24.305(b), and whether "[i]mmediate action is necessary to protect the public interest," 24 C.F.R. § 24.400. *See also* 24 C.F.R. § 24.115 (stating that "[i]n order to protect the public interest, it is the policy of the Federal Government to conduct business only with responsible persons," and that debarment and suspension "are appropriate means to implement this policy"). As the decision to suspend a contractor is therefore "grounded in the policy of the regulatory regime," *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267, it is protected by the discretionary function exception.

## IV

Apparently recognizing that suspension itself is a discretionary function, plaintiffs focus their primary attention not on the suspension but on the investigation and audit that preceded it. Although suspension may be discretionary, they argue, standards of professional practice constrain HUD's auditors during the investigatory phase and preclude application of the discretionary function exception.

This argument fails for two reasons. First, it is impossible to sever HUD's investigation from the subsequent suspension in the way plaintiffs urge. Second, even if the investigation could be severed, it, too, constitutes a discretionary function under *Gaubert*.

### A

■ In *Gray v. Bell*, we held that where the "allegation of improper investigatory conduct is inextricably tied to the decision to prosecute and the presentation of evidence," the discretionary function exception applies and preserves governmental immunity. 712 F.2d 490, 516 (D.C.Cir. 1983); *see Moore*, 65 F.3d at 196–97; *Ernst v. Child & Youth Servs. of Chester County*, 108 F.3d 486, 488–89 (3d Cir. 1997). *Gray* involved a suit brought by Acting FBI Director L. Patrick Gray III. Gray had been investigated and then indicted for allegedly authorizing warrantless searches of the homes of friends and relatives of Weatherman Underground fugitives. After the government agreed to dismiss the indictment, Gray sued the prosecutors for the "improper, tortious, and constitutionally defective manner in which [the] investigation was carried out." 712 F.2d at 515. In particular, he contended that the Justice Department had conducted a grossly negligent pre-indictment investigation, and, as a result, failed to present exculpatory evidence and instead presented false and misleading evidence to the grand jury. *Id.* at 495, 516.

On appeal, this court concluded that Gray's suit was barred by the FTCA's discretionary function exception, because there was "no meaningful way in which the allegedly negligent investigatory acts could be considered apart from the totality of the prosecution." *Id.* at 516. The "gist of Gray's complaint," we said, focused "on alleged causal links between the negligent

investigation, the presentation of false and misleading evidence, and the ultimate prosecution." *Id.* Under those circumstances, "[s]eparating allegations in the complaint that focus on the investigation from the ultimate prosecution merely would elevate the form of Gray's complaint over its essence." *Id.*

In this case, as in *Gray,* the challenged investigation is inextricably tied to the discretionary, quasi-prosecutorial decision to suspend plaintiffs from governmental contracting. The complaint does not allege any damages arising from the investigation itself, but only harm caused by the suspension to which it assertedly led. *See* First Am. Compl. ¶ 200 (reciting that plaintiffs were damaged by having to challenge wrongful suspension, defend in debarment proceeding, and appeal HUD decision); *id.* ¶ 201 ("Sloan and Furby were further actually damaged because *during the period of their wrongful suspension* they were prevented from obtaining any contract work from HUD, were prevented from obtaining other contract work *as a result of the wrongful suspension* and suffered in standing and professional reputation." (emphasis added)). At oral argument, plaintiffs were given a further opportunity to disentangle the investigation and suspension by proffering an amendment to the complaint that would allege some harm arising from the investigation that was separate from the suspension itself; they were unable to do so. Because the allegedly improper investigation thus caused no injury "distinct from the harm caused by the ultimate prosecution itself," the former is not "sufficiently separable from [the] protected discretionary decision[ ]" and "cannot by itself support suit under the FTCA." *Gray,* 712 F.2d at 515; *see General Dynamics,* 139 F.3d at 1285–86 (holding discretionary function exception protected Defense Department audit where harm to plaintiff arose from subsequent criminal prosecution).

### B

Even if HUD's investigation of the Burns Heights project were not inextricably linked to the plaintiffs' suspension, that investigation would nonetheless constitute a discretionary function under the *Gaubert* test. We consider the two elements of that test below.

### 1

First, the sifting of evidence, the weighing of its significance, and the myriad other decisions made during investigations plainly involve elements of judgment and choice.[1] That the conduct at issue here was undertaken by investigators and auditors rather than by Assistant Secretaries is irrelevant. In *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), for example, the Federal Aviation Administration (FAA) had established a regulatory regime of "spot checking" airplanes for compliance with safety standards. As the Supreme Court later explained in *Gaubert,* *Varig* "held that not only was this act discretionary but so too were the acts of agency employees in executing the program since they had a range of discretion to exercise in deciding how to carry out the spotcheck activity." *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267 (citing *Varig,* 467 U.S. at 820, 104 S.Ct. 2755). The discretionary function exception, the Court held, does not apply "exclusively to policymaking or planning functions," but rather extends as well to decisions made at the operational level. 499 U.S. at 325, 111 S.Ct. 1267.

Plaintiffs insist that the Burns Heights investigation differs from others because it took the form of an "audit." "[T]he actions of government auditors are not discretionary," plaintiffs argue, "because compliance with federal audit guidelines is

---

1. *See Sabow v. United States,* 93 F.3d 1445, 1452–53 (9th Cir.1996); *Black Hills Aviation, Inc. v. United States,* 34 F.3d 968, 973–74 (10th Cir.1994); *Blakey v. U.S.S. Iowa,* 991 F.2d 148, 153–54 (4th Cir.1993); *Pooler v. United States,* 787 F.2d 868, 870–71 (3d Cir. 1986).

mandatory." Appellants' Br. at 14.[2] It is true that the Inspector General Act of 1978 commands OIG auditors to "comply with standards established by the Comptroller General of the United States for audits of Federal ... programs, activities, and functions." 5 U.S.C. app. 3, § 4(b)(1)(A). But it is also clear that the auditing standards that plaintiffs contend HUD transgressed leave ample room for the exercise of professional judgment. *See* GEN. ACCOUNTING OFFICE, GOV'T AUDITING STANDARDS, at chs. 3, 6 (June 1994) [hereinafter GOV'T AUDITING STANDARDS]; *cf. Thor Power Tool Co. v. Commissioner of Internal Revenue*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) ("Accountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. 'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to manage-

ment." (citation omitted)).[3] Indeed, those standards expressly state that "[a]uditors should use sound professional judgment in determining the standards that apply to the work to be conducted." GOV'T AUDITING STANDARDS § 3.29.[4]

Plaintiffs' argument here parallels that made by the plaintiff in *Gaubert*, who sought damages for the alleged negligence of Federal Home Loan Bank Board (FHLBB) officials in the day-to-day management of a failing financial institution. Gaubert argued that the FHLBB's actions fell outside the discretionary function exception "because they involved the mere application of technical skills and business expertise." 499 U.S. at 331, 111 S.Ct. 1267. The Court rejected that argument, stating that while "[i]t may be that certain decisions resting on mathematical calculations, for example, involve no choice or judgment in carrying out the calculations," the FHLBB's actions "involved the exercise of choice and judgment" and hence fell within the exception. *Id.* The same is true here.[5]

**2.** Although termed an "audit," HUD's investigation was not a "financial statement audit" designed to determine conformity with generally accepted accounting principles, but rather a "program audit"—a variety of "performance audit" intended to assess the performance of a government program. *Compare* GEN. ACCOUNTING OFFICE, GOV'T AUDITING STANDARDS § 2.4 (June 1994), *with id.* § 2.7(b). *See* O'REILLY ET AL., MONTGOMERY'S AUDITING 23 (11th ed.1994) (noting that program audits are often not stated "in terms of economic actions or events" and "may at times stretch the definition of auditing").

**3.** The principal standards that plaintiffs contend HUD violated are: GOV'T AUDITING STANDARDS § 3.3 ("The staff assigned to conduct the audit should collectively possess adequate professional proficiency for the tasks required."); § 3.11 ("[T]he audit organization and the individual auditors ... should maintain an independent attitude and appearance."); § 3.31 ("Each audit organization ... should have an appropriate internal quality control system...."); § 6.2 ("Work is to be adequately planned."); § 6.5(g) ("[A]uditors should ... [i]dentify potential sources of data that could be used as audit evidence and consider the validity and reliability of these data."); § 6.22 ("Staff are to be properly supervised."); and § 6.46 ("Sufficient, competent, and relevant evidence is to be obtained

to afford a reasonable basis for the auditors' findings and conclusions."). *See generally Moore*, 65 F.3d at 197 n. 15 (holding that deciding what is required by regulation directing prosecutors to disclose "substantial" evidence "directly" negating the guilt of a suspect "is itself a discretionary act").

**4.** *See also* OIG, HUD, CONSOLIDATED AUDIT GUIDE FOR AUDITS OF HUD PROGRAMS § 1–1 (Aug. 1997) ("This guide is not ... intended to supplant the auditor's judgment of audit work required."); OMB Circular A–133, Audits of Institutions of Higher Education and Other Nonprofit Organizations, 55 Fed.Reg. 10,019, 10,021 (Mar. 16, 1990) ("These principles, to the extent permitted by law, constitute guidance to be applied by agencies consistent with and within the discretion, conferred by the statutes governing agency action."); AM. INST. OF CERTIFIED PUB. ACCOUNTANTS, CODIFICATION OF STATEMENTS ON AUDITING STANDARDS, AU § 110.04 (1995) ("In the observance of generally accepted auditing standards, the independent auditor must exercise his judgment in determining which auditing procedures are necessary in the circumstances to afford a reasonable basis for his opinion.").

**5.** This case is readily distinguishable from *Appley Brothers v. United States*, 164 F.3d 1164 (8th Cir.1999), upon which plaintiffs

As plaintiffs themselves point out, the heart of the auditing standards is the exhortation that "[d]ue professional care should be used in conducting [an] audit and in preparing related reports." Gov't Auditing Standards § 3.26; *see id.* § 3.28 ("[E]xercising due professional care means using sound judgment in establishing the scope, selecting the methodology, and choosing tests and procedures for the audit."). Plaintiffs endeavor to turn this point on its head, arguing that because the use of sound professional judgment by auditors is mandatory, no discretion is left to them. The flaw in this argument is that the Supreme Court has *defined* a "discretionary act" as "one that involves choice or judgment." *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267 (emphasis added); *see Moore*, 65 F.3d at 197 (stating that "actions that require the prosecutor to exercise his professional judgment ... are ... quintessentially discretionary"). Hence, plaintiffs' argument reduces to nothing more than the untenable contention that auditors lack discretion because they must exercise it.

### 2

Plaintiffs contend that even if the auditors' conduct does involve an element of discretion, it "does not implicate considerations of public policy or involve the exercise of political, social, or economic judgment." Appellants' Br. at 22. Therefore, they argue, the audit fails *Gaubert's* second prong. Again, we disagree.

HUD's audit of Burns Heights was part of a national audit of lead-based paint contracting activities. *See* Audit Report at 2, 4. Its objective was to determine whether lead-based paint abatement at the facility

was in compliance with the demolition contract. *Id.* at 2. Pursuant to the same auditing standards cited by plaintiffs, one of HUD's responsibilities was to determine "the extent to which the desired results or benefits established by the legislature or other authorizing body are being achieved." Gov't Auditing Standards § 2.7(b). The audit concluded that the housing authority had "not protected tenants or community residents from potential health problems from improper lead-based paint removal and disposal." Audit Report at 3. Whether that conclusion is correct or not, it unquestionably implicates considerations of public policy.

As was true of the first part of the discretionary function test, satisfaction of the second is not limited to actions taken at the policy-planning level. Thus, in *Gaubert*, the Court held that the conduct of FHLBB employees "involved the kind of policy judgment that the discretionary function exception was designed to shield," notwithstanding that it consisted of day-to-day decisions regarding the operations of a savings and loan. *Id.* at 332, 111 S.Ct. 1267. "[T]hose day-to-day 'operational' decisions were undertaken for policy reasons of primary concern to the regulatory agencies," the Court said, including preservation of the assets of the institution "for the benefit of depositors and shareholders." *Id.* (citation omitted). *See also Varig*, 467 U.S. at 815–20, 104 S.Ct. 2755. The same is true in this case: the auditors' decisions were undertaken for policy reasons of significant concern to HUD, including the protection of tenants living in HUD-funded housing "from potential health problems from improper lead-based paint removal and disposal." Audit Report at 3.[6] Accordingly, the audit falls

---

heavily rely, in which the Eighth Circuit held the discretionary function exception inapplicable to an Agriculture Department inspector's failure to investigate grain shortages at a warehouse. The court noted that "although the inspector had discretion in selecting *how* he would investigate," under express regulations "he had no discretion not to undertake *some* investigation." *Id.* at 1172 (emphasis added). Plaintiffs' challenge here, by contrast, is to *how* HUD investigated at Burns Heights.

6. This distinguishes the HUD audit from the placement of road signs by the National Park Service, which we found to involve engineering rather than policy judgment in *Cope*, 45 F.3d at 451–52. *See Berkovitz*, 486 U.S. at 545, 108 S.Ct. 1954 (indicating that determinations involving the "application of objective scientific standards" do not involve policy judgment and are not covered by the discretionary function exception); *see also Black Hills Aviation*, 34 F.3d at 976 (holding that quick handling of crash investigation to facili-

under the aegis of the discretionary function exception to the FTCA.

## IV

Because the discretionary function exception applies to the agency actions challenged by plaintiffs, the district court

---

tate Army activities involves policy judgment); *Blakey,* 991 F.2d at 153 (holding that course

lacked jurisdiction over their FTCA complaint. The court's dismissal of the complaint is therefore

*Affirmed.*

of military investigation "implicates policy considerations").