# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 11, 2013      Decided December 13, 2013

Reissued January 15, 2014

No. 12-5287

DIANNE D. SLEDGE, CO-PERSONAL REPRESENTATIVE OF THE
ESTATE OF RICO WOODLAND, ET AL.,
APPELLANTS

v.

FEDERAL BUREAU OF PRISONS,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-00742)

*Stephen V. Carey* argued the cause for appellants. With him on the briefs were *David P. Donovan* and *Philip R. Seybold.*

*Heather Graham-Oliver*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *R. Craig Lawrence* and *Michelle Lo*, Assistant U.S. Attorneys.

Before: KAVANAUGH, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

**I**

RANDOLPH, *Senior Circuit Judge*: This case arises from an altercation between Rico Woodland, an inmate at the Federal Correctional Institution in Allenwood, Pennsylvania, and a fellow inmate, Jesse Sparks. At 12:37 p.m. on October 15, 2002, Woodland and Sparks entered their cell. The two began to fight and were initially evenly matched, but Woodland became unable to defend himself (possibly because of an asthma attack).[1] Woodland was discovered at 1:05 p.m. with severe injuries, and was taken to a nearby hospital. He remained in a coma for several months, suffered brain damage, lost the use of his limbs, and eventually passed away on January 29, 2006.

Officer Richard Sweithelm was the corrections officer assigned to Woodland's housing unit on the afternoon of the assault. Officer Sweithelm assumed his post at about noon. At 12:37 p.m., just before Woodland and Sparks began their fight, Officer Sweithelm left the housing unit, and the prison began a "controlled movement." Controlled movements are regular ten-minute periods during which inmates can move from one part of the institution to another (for example, from housing units to a recreation facility or the dining hall). Officer Sweithelm remained outside the housing unit throughout this controlled movement. He smoked a cigarette, chatted with a fellow corrections officer, and watched inmate traffic entering and

---

[1] Sparks was charged with and pled guilty to the assault.

leaving the housing unit. He did not go back inside until 12:48 p.m., after the controlled movement was complete.

Woodland, and later his family and estate, claimed that the government was liable for Woodland's injuries because Officer Sweithelm acted negligently by standing outside and failing to monitor the interior of the housing unit during the assault. After exhausting administrative remedies, Teresa Sledge, the personal representative of Woodland's estate, sued the government in the district court.[2] Invoking the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, Sledge argued that the government was liable for personal injury and wrongful death under Pennsylvania law.[3]

The government moved to dismiss the complaint. It argued that Officer Sweithelm's conduct was protected by the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and that Sledge's claims were therefore outside the district court's subject-matter jurisdiction. The district court granted Sledge limited jurisdictional discovery and, after a hearing, dismissed the complaint. The opinion of the district court is reported at *Sledge v. United States*, 883 F. Supp. 2d 71 (D.D.C. 2012). Sledge timely appealed.

---

[2] The suit was originally filed by Steven Sledge as personal representative of Woodland's estate. Steven Sledge passed away after the case was filed, and the district court granted a motion to substitute party.

[3] The complaint also challenged Woodland's medical treatment after the assault. Those claims are not the subject of this appeal. Liability under the Federal Tort Claims Act is determined "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1); *see id.* § 2674, here, Pennsylvania.

4

**II**

The Federal Tort Claims Act grants district courts exclusive jurisdiction to hear certain tort claims against the United States, including claims for "personal injury or death" based on the "negligent or wrongful act[s] or omission[s]" of government employees on the job. 28 U.S.C. § 1346(b)(1); *see id.* § 2674. The Act's broad jurisdictional grant is subject to exceptions. *See id.* § 2680. Among those, the discretionary function exception bars courts from hearing claims "based upon the exercise . . . or the failure to exercise . . . a discretionary function or duty on the part of . . . an employee of the Government, whether or not the discretion involved [was] abused." *Id.* § 2680(a).

We have treated the exception as jurisdictional: if it applies to the conduct of which a plaintiff complains, then "the district court lacks subject matter jurisdiction over the case." *Sloan v. U.S. Dep't of Hous. & Urban Dev.*, 236 F.3d 756, 759 (D.C. Cir. 2001); *see Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995). We review *de novo* a district court's decision whether the exception applies. *Loughlin v. United States*, 393 F.3d 155, 162-63 (D.C. Cir. 2004).

Courts apply the exception using the two-part *Gaubert*/*Berkovitz* test. *See United States v. Gaubert*, 499 U.S. 315 (1991); *Berkovitz v. United States*, 486 U.S. 531 (1988); *Sloan*, 236 F.3d at 759-60; *Cope*, 45 F.3d at 448-49. First, a court must ask whether a "statute, regulation, or policy" directs a government employee to conduct himself in a particular way. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). If so, then the employee's conduct is not discretionary and the exception does not protect him. *Id.* at 322, 324. In that case, the court proceeds under the first clause of 28 U.S.C. § 2680(a), and the government is immune from suit if and only if the employee followed the directive. *Cope*, 45 F.3d at 448. If a written directive is unambiguous then oral testimony cannot contradict

it. *See Shansky v. United States*, 164 F.3d 688, 691-92 (1st Cir. 1999). The testimony of government officials may be used to clarify or establish a directive. *See, e.g.*, *Macharia v. United States*, 334 F.3d 61, 65-66 (D.C. Cir. 2003).

If there is no "statute, regulation, or policy" on point, then the employee's conduct is discretionary and the inquiry moves to step two. At step two the court must decide whether that discretion is the type "that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536). The precise contours of this test are difficult to pin down. *Cope*, 45 F.3d at 448-49. The paradigmatic example of step two in action is negligent driving by a government employee on the job. *Gaubert*, 499 U.S. at 325 n.7. Although "driving requires the constant exercise of discretion," negligent driving is unprotected because it "can hardly be said to be grounded in regulatory policy." *Id.* Otherwise, we are left with the Supreme Court's statement that conduct is protected only if it is "based on considerations of public policy" such as "social, economic, [or] political" concerns. *Id.* at 323 (internal quotation marks omitted). In that calculus, the nature of the conduct, rather than the subjective intent of the actor, is what matters. The court must ask whether the challenged actions are amenable to public policy analysis, even if the actor was not acting out of public-policy motives. *Id.* at 325.

**III**

Sledge argues that Officer Sweithelm violated a mandatory directive by failing to monitor the inside of the housing unit. That directive is contained in what prison officials refer to as a post order. Post orders are adopted by individual correctional institutions,[4] and govern the conduct of corrections officers while they serve at a particular post within the institution. Post orders constitute government policy within a prison. *See, e.g.*, *Garza v. United States*, 161 F. App'x 341, 345 (5th Cir. 2005). The post order Sledge identifies requires all housing unit officers to "continuously monitor inmate traffic within and outside of the units" during controlled movements. Sledge asserts that this post order is unambiguous in at least one respect: whatever discretion Officer Sweithelm had, he *was required* to visually inspect the *interior* of the housing unit during the movement, which he altogether failed to do. Therefore, Sledge concludes, Officer Sweithelm's conduct is unprotected at *Gaubert*/*Berkovitz* step one.

Sledge's position finds some support in the case law. Courts have held that corrections-officer conduct is not protected when it contravenes specific and unambiguous directives, such as "account[] for and dispose[] of" "all razors" "at the end of the shower," *Gray v. United States*, 486 F. App'x 975, 978 (3d Cir. 2012), or "patrol the recreation yard" "[d]uring closed movement[s]," *Garza*, 161 F. App'x at 344-45. But courts reach a different conclusion when directives are phrased in more general terms or when the terms themselves are ambiguous, such as directives to "take disciplinary action at such times and to the

---

[4] Corrections officers are also subject to directives contained in program statements, which are adopted by the Bureau of Prisons, and institutional supplements, which apply program statements to particular institutions.

degree necessary to regulate an inmate's behavior," *Calderon v. United States*, 123 F.3d 947, 949 (7th Cir. 1997) (emphasis omitted) (citing 28 C.F.R. § 541.10(b)(2)), or "[do] not . . . allow[ inmates] to gather in large groups," *Garza*, 161 F. App'x at 345. Those directives provide discretion about how and when a corrections officer should act, even if they have a readily discernable objective. *See Garza*, 161 F. App'x at 345-46; *Calderon*, 123 F.3d at 949-50.

Although the question is close, we think the post order to "continuously monitor inmate traffic within . . . the unit[]" falls into the discretionary category. Sledge argues that the order obligated Officer Sweithelm to look inside the housing unit. That interpretation is plausible, though not required, when the particular phrase is read in isolation. But read in context, the order confers discretion on Officer Sweithelm to act as he did. It directs him to monitor the flow of inmates into and out of the housing unit without telling him precisely how to do so or where to stand.

First, the order requires "continuous[]" monitoring of inmate traffic both "within *and outside* of the units" (emphasis added). Sledge's interpretation, that "within" designates inmates already inside the housing unit, appears to require the impossible. A unit officer cannot continuously observe two different locations, separated by a wall, at the same time. *See Sledge*, 883 F. Supp. 2d at 85. We are not inclined to accept Sledge's "tortured reading" of the order. *Id.*

Second, the order refers to "inmate traffic." In the context of controlled movements, during which inmates can move from one area of the institution to another, "inmate traffic" likely refers to ingress, egress, and travel between buildings, rather than inmates moving about the interior of housing units. If the post order required Officer Sweithelm to monitor the inside of the housing unit, it is difficult to see why it would be confined

to monitoring "traffic." Inmates inside a housing unit could pose a security risk whether or not they were moving around. If the prison wanted to adopt Sledge's interpretation, it would make more sense to speak of "*inmates* within and outside of the units" rather than "inmate *traffic.*"

Third, the remainder of the order undermines Sledge's interpretation. The penultimate sentence of the disputed paragraph directs unit offers to "[m]aintain[] high visibility" in order to "disrupt inmate chances of bringing contraband into the unit." That directive is not easily reconciled with Sledge's suggestion that Officer Sweithelm stand in the sallyport, an approximately seven-foot-by-nine-foot room between the inner and outer doors to the housing unit. Standing there would minimize his visibility, according to the deposition testimony of several prison officials.

That same testimony generally approved of Officer Sweithelm's conduct and rejected Sledge's interpretation of the post order. Robert Womeldorf, the Operations Lieutenant, explained that during a controlled movement "there's no need to monitor your inmates . . . inside your housing unit because they're not moving anywhere. You're watching the inmates go from point A to point B." Other officials were more emphatic. Stanley Yates, the Allenwood Warden at the time of the assault, stated that housing offers were "directed" to "stand[] in the front of the housing unit, . . . controlling th[e] compound," and that to do otherwise would have been irresponsible. "[I]f [a unit officer] went back in and stayed in" there would be no "officer paying attention to the flow of traffic." To Warden Yates this would constitute a dereliction of the officer's duty.

We also reject Sledge's interpretation of the post order because it is contrary to sound public policy and prison security. At the very least, these considerations lead us to conclude that the order and the discretion it conferred were grounded in public

policy. The policy problem is one of resource allocation. In a prison with 1,300-1,400 inmates it is impossible to keep each inmate in view at all times. During a controlled movement, 60 to 70 percent of inmates are outside, and prison officials therefore want more eyes watching inmate movement between buildings. By standing outside during controlled movements, unit officers can observe any events on the compound and respond quickly by closing the doors and securing the housing units. Monitoring inmate flow from the outside also helps prevent inmates from moving contraband into the housing units, which is a stated objective of the post order. Without housing unit officers observing inmate traffic, the large group of inmates moving between buildings would lack substantial supervision. We are thus persuaded that the order provided Officer Sweithelm with discretion to act as he did.

Sledge also argues that Officer Sweithelm violated orders that he remain at his post when he left the housing unit and stood several yards beyond the door. Sledge is correct that corrections officers may not leave their posts. But the orders do not identify the boundaries of the housing unit post, and the record does not support Sledge's claim that the boundaries are the walls of the housing unit. When asked directly about the issue, prison officials stated Officer Sweithelm's post included the area closely surrounding the housing unit. Relying on this testimony, and the absence of any order directing Officer Sweithelm to stand in a certain location, the district court correctly found that Officer Sweithelm did not leave his post. *Sledge*, 883 F. Supp. 2d at 84-85.

As to *Gaubert*/*Berkovitz* step two, Sledge argues that the exception does not protect Officer Sweithelm because he was not actually exercising discretion. Instead, Sledge alleges, Officer Sweithelm utterly neglected his duties. He stepped outside to smoke, pace, and talk, but not to monitor inmates. Sledge relies on other negligent guard cases. In those cases,

courts have held (or recognized the possibility in dicta) that the discretionary function exception does not protect corrections officers who are totally derelict of duty, for example, by packing up personal belongings and leaving early, *Chess v. United States*, 836 F. Supp. 2d 742, 751 (N.D. Ill. 2011), or by completely failing to perform required inspections, *Coulthurst v. United States*, 214 F.3d 106, 110-11 (2d Cir. 2000).

The validity of the negligent guard theory is an open question in this court. Even if that theory could ever allow a plaintiff's claim to survive the discretionary function exception, it would not do so here. The Supreme Court stated in *Gaubert* that the "focus of the inquiry [at step two] is not on the agent's subjective intent in exercising the discretion . . ., but on the nature of the actions taken and on whether they are susceptible to policy analysis." 499 U.S. at 325. We read the negligent guard cases in light of that statement. The problem with packing up personal belongings while still on the clock, for example, is not that a particular corrections officer does so for purely personal non-policy reasons. The problem is that there can never be a public-policy reason for doing so. Thus the decision to pack up early is unprotected.

Aside from subjective intent, the "nature of the actions" that might give rise to liability in this case is that Officer Sweithelm stood outside without looking into the housing unit. Even if Sledge is correct that Officer Sweithelm so acted merely to satisfy a nicotine craving, that motivation is irrelevant. The decision to stand outside, as explained above, is "susceptible to policy analysis." *Id.* Prison officials testified to several reasons why they would permit, or even advise, a housing unit officer to stand outside and monitor the compound during controlled movements. Officer Sweithelm's conduct is therefore protected at step two, as well as step one. *See Sledge*, 883 F. Supp. 2d at 86-87.

Because the discretionary function exception denies the district court subject-matter jurisdiction over Sledge's complaint, the decision of the district court is

*Affirmed.*